Brittany DIXON; Patricia Taber; Martha Elizabeth Wathen–Collier; Monica Sykes; Candace Williams; Tasha Allen; Jessica Gordan; Darena Prescott; Tina Cain; Kimberly Milan; and Amy Lee, Appellants

v.

DAYMAR COLLEGES GROUP, LLC; Daymar Learning of Paducah, Inc.; Daymar Learning of Ohio, Inc.; Mark Gabis (Now Deceased); and Daymar Learning, Inc., Appellees

2012–SC–000687–DG

Supreme Court of Kentucky.

RENDERED: APRIL 2, 2015

Rehearing Denied September 23, 2015

Counsel for Appellants: Kenneth L. Sales, Leslie Metcalf Cronen, Bubalo Goode Sales & Bliss, PLC, Mark P. Bryant, Emily M.W. Roark, Ben Elliott Stewart, Bryant Law Center, P.S.C., David G. Bryant, Jones Ward, PLC.

Counsel for Appellees: Caroline Lynch Pieroni, Robert Kenyon Meyer, Stephen Joseph Mattingly, Dinsmore & Shohl, LLP.

Counsel for Amicus Curiae, Kentucky Justice Association: Kevin Crosby Burke.

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

A group of students[1] challenges Daymar College's enrollment process as both procedurally and substantively unconscionable. Specifically, the Students challenge the incorporation of an arbitration provision on the reverse side of the Student Enrollment Agreement. Despite this arbitration provision, the Students filed a lawsuit in circuit court.

The trial court refused to compel arbitration, finding the arbitration provision both procedurally and substantively unconscionable. Daymar appealed and the Court of Appeals reversed the trial court. We reverse the Court of Appeals and hold, instead, that the trial court was correct but for reasons different from those identified by the trial court. Because Daymar's attempted incorporation was unsuccessful, the Students were not subject to the arbitration provision; as a result, arbitration was rightly denied.

---

1. This case involves numerous similarly situated plaintiffs, *i.e.*, students who enrolled at Daymar's Paducah, Kentucky, campus, now alleging various claims regarding the validity of the enrollment agreement they were asked to sign by Daymar. In the sake of brevity and convenience, we will use *the Students* throughout this opinion when referring to the collection of student-plaintiffs. Any specific name used will refer only to that particular plaintiff.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Daymar is a for-profit institution offering degrees in such areas as Graphic Design, Pharmacy Technology, and Business Administration. Founded in 1963 in Owensboro, Kentucky, Daymar has grown considerably over the past fifty years and now operates campuses under various names in Kentucky, Ohio, and Tennessee, with a strong online-education presence as well. In Kentucky alone, Daymar has a presence in seven locations. All the students represented in this action attended the location in Paducah, Kentucky.

It is not difficult to understand the appeal of Daymar as a higher-education option for many. Generally speaking, Daymar offers the opportunity to obtain a degree in a specialized field with, according to Daymar, high employment possibilities—all within a more condensed timeline than traditional higher-education institutions. But, according to the Students, Daymar's self-promotion and attractive promises to students amounted to deception. Facing unemployment or low wages in jobs unrelated' to their fields of study, the Students commenced the instant suit against Daymar in 2010.[2]

Primarily, the Students' suit revolved around the harried admissions process they underwent and the promises or representations made during that experience. Upon arriving at Daymar's campus, the Students began the enrollment process by filling out a prospective-student questionnaire. The Students then met with an admissions representative for approximately thirty minutes to an hour. During this meeting, the Students were required to complete an interview, view a PowerPoint presentation on available academic programs, and complete a 12–minute Wonderlic Cognitive Ability Test. Additionally, the Students were given the option to take a tour of the campus if they desired. After completing all these tasks, the Students were directed to meet with an enrollment counselor, during which they were expected to sign at least twelve pages of documents. The Student Enrollment Agreement (Agreement)—the contract at issue in this case—was presented to the Students at this time.

The Students claim they were not able to ask any questions about the documents they were signing and were actually told not to read the documents but, instead, to read them at home after signing. Daymar disputes this allegation and claims the Students were directed to "read the document, front and back." Each student received a carbon copy of the Agreement to take home immediately after signing. Some of the Students allege this process was so abridged and pressure-filled they enrolled without having any intention of doing so or knowledge that they, in fact, did enroll.[3]

The Agreement is a single page, front and back. Notably, the Students only signed the front of the Agreement. As a prerequisite to attend Daymar, the Students were required to fill out and sign the Agreement. The Students were unable—actually not allowed—to amend or negoti-

---

2. The Students brought a host of claims against Daymar: civil conspiracy, breach of contract, breach of implied contract, fraudulent inducement, violations of Kentucky consumer-protection statutes, negligent misrepresentation, violations of Kentucky antitrust statutes, and violations of Kentucky proprietary education statutes.

3. These Students allege they went to Daymar only to get a better understanding of their options and discuss enrolling at a later date and left the campus unwittingly enrolled in Daymar. At least one Student was entirely unaware she had enrolled until receiving correspondence from Daymar informing her that classes were starting soon.

ate any of the terms of the Agreement. Essentially, the Agreement provides an account of what program the student is registering for; how many credits are required for that degree; an estimation of how long it will take to achieve those credits; and how much the program will cost with tuition, books, and fees. Directly above the signature line, the Students were required to initial in a blank space next to a provision indicating they had read all the terms of the Agreement. Also located above the Students' signature, in plain type, is the following incorporation language:

> This Agreement and any applicable amendments, which are incorporated herein by reference, are the full and complete agreement between me and the College.

On the reverse page of the Agreement, the Students encountered a sea of plain-type provisions dealing with tuition refunds, curriculum changes, Daymar's permission to contact the Students or their employer, and *arbitration*. Located at the bottom of the reverse page, the arbitration provision, again in plain type, specified that "[a]ny dispute, controversy, or claim arising out of or relating to my enrollment at the College, this Agreement, or the breach thereof, . . . be resolved by arbitration[.]" Of note in the terms of the arbitration provision: (1) the Students are required to split the costs of arbitration with Daymar; (2) the Students are responsible for their own attorneys' fees; (3) the validity or enforceability of the arbitration provision is a question for the arbitrator, not a court; and (4) Kentucky law shall govern the validity, interpretation, and performance of the Agreement.

The Students claim they were entirely unaware of the arbitration provision's existence, let alone its meaning. Even if the Students were aware of the arbitration provision's existence and had the perceptiveness to ask an admissions counselor about it, Daymar admits that no admissions counselor could have explained what it meant or how it operates. Indeed, Daymar representatives testified students had never been notified that the arbitration provision existed in the document or that by signing it they were waiving their constitutional right to a jury. Curiously enough, enrollment counselors were ready and able to explain every other portion of the Agreement except the arbitration provision.

Relying on the Agreement each of the Students signed during this admissions process, Daymar petitioned the trial court to dismiss the suit to arbitration. The Students argued the arbitration provision was both procedurally and substantively unconscionable. At the hearing on the matter, in addition to evidence regarding the admission process, the Students presented a great deal of evidence pertaining to their current economic station and the high cost associated with arbitration. In summary, the trial court's findings of fact provide a consistent theme of large amounts of student debt and low, often near-minimum wage, earnings. The trial court also heard expert testimony regarding the high costs associated with arbitration.[4] In the end, the trial court found the arbitration agreement both procedurally and substantively unconscionable—procedurally because of the rushed admissions

---

4. While this action was pending, Daymar offered to front the costs of arbitration for the Students with the condition that the Students reimburse Daymar in the event their claims were unsuccessful. Eventually, Daymar offered to front the costs with no reimbursement requirement. Daymar alleges that the trial court misunderstood its offer and that it was always willing to front the costs with no expectation of reimbursement.

process and substantially because the costs of arbitration were unduly expensive.

The Court of Appeals summarily rejected the Students' argument regarding unconscionability, both procedural and substantive. As for procedural unconscionability, the Court of Appeals found the Agreement was not procedurally unconscionable simply because it could be characterized as a contract of adhesion, as the Students had argued. The Court of Appeals noted that the Students were given an opportunity to read the terms on both sides of the Agreement, and the terms were conspicuous and comprehensible. In the view of the Court of Appeals, if the trial court's undue-expense analysis was upheld, "a very large portion of the citizenry of this Commonwealth would be able to avoid a contractual commitment to arbitrate merely by showing the court that they made less than a certain salary." Finally, the Court of Appeals rejected the Students' argument that the arbitration provision was not properly incorporated because they signed in the middle of the two-page document. The Court of Appeals focused its analysis on the fact that the Students' signatures were found below the incorporating language.

## II. ANALYSIS.

To paraphrase the Supreme Court of the United States in *First Options of Chicago, Inc. v. Kaplan,*[5] the dispute between the Students and Daymar involves three narrow disagreements: (1) the Students and Daymar disagree about whether Daymar fraudulently induced the Students' enrollment—the *merits* of the dispute; (2) the Students challenge whether they actually agreed to arbitrate the merits—disagreeing over the *arbitrability* of the merits; and (3) the question of *"who should have the primary power to decide the second matter."*[6] We are concerned with only the second and third questions. We begin with the third.

The parties initially debated whether the merits of this action should be considered under the Federal Arbitration Act (FAA) or the Kentucky Uniform Arbitration Act (KUAA). At this point in the litigation, the parties—along with the trial court and the Court of Appeals—have essentially agreed that the FAA governs. The basis for such agreement is easily found in the FAA's declaration that it shall apply to "[a] written provision in any ... contract evidencing a transaction involving commerce[.]"[7] Of course, Daymar argues there is clearly a transaction involving commerce among the states because the Students ordered books for their classes and took out loans to cover the cost of attendance. We do not disagree with Daymar's characterization; but we do note that the arbitration provision contains a choice-of-law provision selecting Kentucky law to govern "[t]he validity, interpretation, and performance of the Agreement[.]" At the very least, Daymar plausibly waived the FAA and opted for the KUAA to apply.

The resolution of this debate is rather immaterial. We have routinely interpret-

---

**5.** 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

**6.** *Id.* at 943, 115 S.Ct. 1920.

**7.** 9 U.S.C. § 2; *see also Southland Corp. v. Keating,* 465 U.S. 1, 11–15, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) ("The Federal Arbitration Act rests on the authority of Congress to enact substantive rules under the Commerce Clause.... We therefore view the 'involving commerce' requirement in § 2, not as an inexplicable limitation on the power of the federal courts, but as a necessary qualification on a statute intended to apply in state and federal courts.").

ed the FAA and KUAA in parallel and recently noted in a similar context that "the two acts function almost identically[,]" [8] Both statutory schemes "reflect the fundamental principle that arbitration is matter of contract." [9] Whether the FAA or KUAA governs is especially unimportant given that both the text of the FAA and jurisprudence involving its interpretation concede that "*whether* there is a valid arbitration agreement is a matter of state contract law, so long as the state law in question does not single out arbitration agreements." [10] So we will abide by how the case has been practiced thus far and apply the FAA in conjunction with our contract law principles.

## A. The Trial Court, not the Arbitrator, was the Proper Forum to Decide the Validity of the Agreement.

### 1. Daymar did not Waive its Challenge to the Trial Court's Authority by not Filing a Cross–Appeal.

■ At both the trial court and the Court of Appeals, Daymar asserted that under the terms of the Agreement, only the arbitrator—not the court—had the authority to determine the enforceability of the arbitration provision. The trial court and the Court of Appeals rejected Daymar's argument. The Court of Appeals did, however, compel the Students to arbitration. Victorious in the Court of Appeals, Daymar did not file a cross-motion for discretionary review in this Court after we granted the Students' motion for dis-

cretionary review. [11] Now, the Students argue Daymar waived the issue by not seeking discretionary review by way of a cross-motion. The Students alternatively argue that the trial court was correct in its determination that it had jurisdiction.

■ Recently, we performed an exhaustive review of our case law controlling when cross-motions for discretionary review are required. We will not repeat that here, but suffice it to say our case law is now clear: cross-motions for discretionary review are required "only where the party is aggrieved by the lower court." [12] More specifically, a prevailing party is not required to pursue "what amounts to a separate appeal to maintain an ongoing dispute over an issue that was raised but, for whatever reason, not decided below." [13] Daymar, undeniably the prevailing party below, was not aggrieved in any way. We admit that the Court of Appeals did address the issue and held that the trial court was the proper forum for the Students' challenge to the arbitration provision. That said, given the resolution of the case by the Court of Appeals, Daymar had little reason for further appeal.

Appealing the issue of whether the trial court or arbitrator should have decided the issue of unconscionability made little sense for Daymar because it achieved its ultimate goal: forcing the Students to arbitrate their claims. As our case law clearly states, Daymar was only required to "raise any other grounds argued to the lower

8. *JPMorgan Chase Bank, N.A. v. Bluegrass Powerboats*, 424 S.W.3d 902, 906 (Ky.2014).

9. *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010).

10. *Bluegrass Powerboats*, 424 S.W.3d at 907; *see also* 9 U.S.C. § 2 (making an arbitration agreement "valid, irrevocable, and enforceable, save upon such grounds as exist at law

or in equity for the revocation of any contract.").

11. Kentucky Rules of Civil Procedure (CR) 76.21(1).

12. *Fischer v. Fischer*, 348 S.W.3d 582, 597 (Ky.2011).

13. *Id.*

court upon which [it] also wishes to rely in [its] responsive brief[,]" which it successfully did here. In short, Daymar did not waive the issue of whether the trial court or arbitrator should decide the issues raised by the Students. And the lower courts were correct in finding that the trial court had authority to resolve the issues presented by the Students.

### 2. The Trial Court Properly Exercised its Jurisdiction Because the Students Challenged Whether There was an Actual Agreement to Arbitrate.

■ In elementary terms, "arbitration is simply a matter of contract between the parties; . . . a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."[14] But this general rule is subject to qualification when deciding, as we are here, whether the parties have agreed to have the arbitrator decide the question of arbitrability via what has become known as a delegation provision. In those situations, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."[15] This Court has yet to encounter a case involving a delegation clause.

■ Broadly speaking, validity challenges to arbitration provisions can be separated into two types: (1) challenging "specifically the validity of the agreement to arbitrate[ ]"[16]; and (2) challenging "the contract as a whole, either on a ground

that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."[17] Per decades of Supreme Court precedent, "only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable."[18] The second class of challenge is within the purview of the arbitrator. Indeed, in *Buckeye Check Cashing, Inc. v. Cardegna*, the Supreme Court noted, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."[19]

Daymar argues that the language of the delegation provision makes it undeniably clear the parties agreed to have the arbitrator decide the issue of arbitrability. The delegation provision provided: "All determinations as to the scope or enforceability of this arbitration provision shall be determined by the arbitrator, and not by the court." In support of this argument, Daymar relies heavily upon the Supreme Court's decision in *Rent–A–Center*. Unfortunately for Daymar, *Rent–A–Center* does not support its position.

As framed in *Rent–A–Center*, the Court was asked to decide whether, under the FAA, a court could decide a challenge to a contract as unconscionable where the agreement expressly delegated that authority to the arbitrator. Jackson, a former employee of Rent-A-Center, filed a

14. *First Options*, 514 U.S. at 943, 115 S.Ct. 1920.

15. *Id.* at 944, 115 S.Ct. 1920 (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)).

16. *Rent–A–Center*, 561 U.S. at 71, 130 S.Ct. 2772 (quoting *Buckeye Check Cashing, Inc. v.*

*Cardegna*, 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)).

17. *Id.* (quoting *Buckeye*, 546 U.S. at 444, 126 S.Ct. 1204).

18. *Id.* at 69, 130 S.Ct. 2772.

19. *Buckeye*, 546 U.S. at 445–46, 126 S.Ct. 1204.

discrimination suit against his former employer; but, as a condition of his employment, Jackson had signed an agreement that required him to pursue claims through arbitration. The agreement provided for the arbitrator to have exclusive authority to determine any issues regarding the enforceability of the agreement. The Ninth Circuit reversed the lower court's order of arbitration, holding that the issue of unconscionability was a threshold question for the courts. Holding that, *absent a specific challenge to the delegation provision itself,* the court must treat the delegation provision as valid and leave the challenge to the validity of the agreement as a whole to the arbitrator, the Court reversed.[20] On its face, *Rent–A–Center* seems to indicate that when a delegation provision is present, a party must challenge it specifically—even aside from the larger arbitration provision in which it may exist—in order to avoid having an arbitrator decide arbitrability. Daymar's reliance on it seems well placed.

But upon closer inspection, *Rent–A–Center* is not dispositive as Daymar asserts. The case is not even applicable here. *Rent–A–Center* has a limited application: when the *"validity* of a written agreement to arbitrate" is in question, *i.e.,* when a party challenges whether an arbitration agreement is legally binding.[21] When a party challenges whether the arbitration agreement—and, by extension, the delegation provision—was in fact agreed to, *Rent–A–Center*'s analytical approach does not apply. Indeed, "[t]he issue of the agreement's Validity' is different from the issue whether any agreement between the parties 'was ever concluded[.]' "[22] *Rent–A–Center* addressed only the former and said nothing about the latter.

Despite not dealing with a delegation clause, we have previously acknowledged a trial court is tasked with determining whether there exists a "valid, binding arbitration agreement" before it may order a case to arbitration.[23] This approach is entirely consistent with *Rent–A–Center* and other Supreme-Court precedent,[24] most notably *First Options.* The *First Options* rule has been succinctly expressed as: "Does the arbitration agreement at issue 'clearly and unmistakably' evince [Appellants'] and [Appellees'] intent to submit

20. *Id.* at 72, 130 S.Ct. 2772.

21. *See id.* at 69 n. 1, 130 S.Ct. 2772.

22. *Id.* at 70 n. 2, 130 S.Ct. 2772 (citing *Buckeye,* 546 U.S. at 444 n. 1, 126 S.Ct. 1204 ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases … which hold that it is for courts to decide *whether the alleged obligor ever signed the contract*[.]") (emphasis added)).

23. *Bluegrass Powerboats,* 424 S.W.3d at 907; see *Ping v. Beverly Enterprises, Inc.,* 376 S.W.3d 581, 590 (Ky.2012) ("Under both Acts, a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate. Unless the parties clearly and unmistakably manifest a contrary intent, that initial showing is addressed to the court, not the arbitrator, and the existence of the agreement depends on state law rules of contract formation.") (citations omitted); *see also N. Fork Collieries, LLC v. Hall,* 322 S.W.3d 98, 102 (Ky.2010) ("[The trial court's] task generally is simply to decide under ordinary contract law whether the asserted arbitration agreement actually exists between the parties and, if so, whether it applies to the claim raised in the complaint.").

24. *See, e.g., Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *First Options,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

questions of arbitrability to the arbitrator?" [25] The *First Options* Court explained that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." [26]

The question now becomes: did the delegation provision clearly and unmistakably evince the parties' intent to submit questions of arbitrability to the arbitrator? The short answer is no. We can concede that the delegation provision was clear; but the language of the delegation provision is largely beside the point "because the gravamen of [the Students'] claim is that [they] never consented to the terms in [the A]greement." [27] The delegation provision may very well have clearly and unmistakably evinced *a party's* intent to arbitrate, but it does not necessarily follow that it speaks for both parties. "In other words, when a party raises a good-faith [formation] challenge to the arbitration agreement itself, that issue must be resolved before a court can say that he clearly and unmistakably intended to *arbitrate* that very validity question." [28]

Here, the Students allege they did not agree to the arbitration or delegation provision. They claim the arbitration provision is not binding on them because their signature was physically inscribed before the arbitration provision in the Agreement itself and the incorporation language was insufficient. And they claim Daymar fraudulently induced them to sign the Agree-

ment. [29] Accordingly, the Students bring a claim targeting the *making* of the arbitration agreement rather than simply its *validity*. In this context, a court is the proper forum for determining whether the arbitration agreement is enforceable, a delegation provision notwithstanding. There exist legitimate questions regarding the valid formation of the Agreement. So the trial court was the proper forum for these proceedings.

**B. The Arbitration Provision was not Properly Incorporated Into the Agreement and, Therefore, was not Binding on the Students.**

We now turn to whether the Students actually agreed to the terms of the arbitration provision and, therefore, whether they were bound by them. The Students argue that they are not bound by the arbitration provision because their signatures were not subscribed at the end of the writing as required by

Kentucky Revised Statute (KRS) 446.060; therefore, all the terms appearing in the document after the signature are void. The Students also disagree with Daymar on whether the language of the Agreement was sufficient to incorporate the arbitration provision. In rebuttal, Daymar alleges that KRS 446.060 is inapplicable because there is no legal requirement that arbitration provisions be signed. Daymar also rejects the argument that the Statute of Frauds applies to the Agreement and asserts that the incorporation language was sufficient. We disagree.

---

25. *Rent–A–Center*, 561 U.S. at 80, 130 S.Ct. 2772 (Stevens, J., dissenting).

26. *First Options*, 514 U.S. at 944, 115 S.Ct. 1920.

27. *Rent–A–Center*, 561 U.S. at 82, 130 S.Ct. 2772 (Stevens, J., dissenting).

28. *Id.*

29. *See Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801 ("Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it.").

Our jurisprudence has no requirement that an arbitration agreement be signed. But the law is clear that an arbitration agreement must be in writing: "[T]here is no question that agreements to arbitrate, to be binding under the federal and state arbitration acts, must be in writing." [30] KRS 446.060 only applies to writings the law requires to be signed. Accordingly, for the statute to be applicable here, there must be a legal concept requiring the Agreement to be signed. We believe the Statute of Frauds requires exactly that.

Pertinent to this action, Kentucky's Statute of Frauds provides:

> No action shall be brought to charge any person ... [u]pon any agreement that is not to be performed within one year from the making thereof ... unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent.[31]

The general rule, with regard to the Statute of Frauds, "is that, if a contract may be performed within a year from the making of it, the inhibition of the Statute does not apply, although its performance may have extended over a greater period of time." [32] But every rule has its exception, and this rule is no different. "When it was contemplated by the parties that the contract would not, and could not, be performed within the year, even though it was *possible* of performance within that time, it comes within the inhibition of the Stat-

ute." [33] Because the Statute of Frauds "refers to a contract which, by its terms, is not to be performed within a year, and which, from its stipulations, is not capable of being performed within a year[, t]he appropriate inquiry thus is whether under the evidence of a particular case the parties contemplated that the contract at issue would be performed within a year, and if, by its terms, it could be." [34]

It cannot be disputed that it is impossible for a student enrolling in Daymar to complete the program and obtain a degree within a year. For example, Brittany Dixon enrolled in the Paralegal Studies program; and her Agreement outlined that she would have to complete 104 credit hours, which would take approximately 9 terms, lasting approximately 24 months. Despite this, Daymar resists the contention that the Agreement could not be performed within one year. In support of its argument, Daymar points out that while the Agreement indicates the total length of the program, admittedly over a year, the Agreement is essentially a term-to-term contract—that is, a student may leave Daymar at the end of an academic term and incur no penalty and owe nothing to Daymar. But this argument does little to undercut what so clearly seems to be the intent of the parties: a contract lasting more than a year.

The Agreement pertains directly to a *program*, not a particular term. It clearly states: "I am enrolling at Daymar College ("College") for the _____ program...." Moreover, when filling out the Agreement,

---

**30.** *Bluegrass Powerboats,* 424 S.W.3d at 910 (citing 9 U.S.C. § 2; KRS 417.050).

**31.** KRS 371.010(7).

**32.** *Sawyer v. Mills,* 295 S.W.3d 79, 84 (Ky. 2009) (quoting *Williamson v. Stafford,* 301 Ky. 59, 190 S.W.2d 859, 860 (1945)).

**33.** *Id.*

**34.** *Id.* (citation omitted).

students are required to fill in the "total charges for my program[,]" including tuition, books, and other fees. These charges are not for a single term but, rather, for the life of the program. It strains credulity to believe that the Agreement indicated to the Students in any meaningful way it was only on a term basis. The only way that a student can *perform* the contract, *i.e.*, earn a degree in her respective program, is to complete the requirements set forth by Daymar—requirements that are impossible to satisfy within a year. The fact that Daymar does not request anything of students who leave at the end of a particular term means little with regard to whether the parties ever contemplated the Agreement would be performed within a year; instead, that indicates Daymar designated situations where a student may walk away rather than fully perform. Walking away and fully performing are not synonymous. It is clear to this Court that when the Students signed the Agreement, they contemplated an obligation that could not be performed within a year. So we hold the Statute of Frauds applies and the Agreement was required to be in writing and signed, which then triggers the applicability of KRS 446.060.

 KRS 446.060 promotes the "principle that when a signature is placed at the end of an agreement, there is a logical inference that the document contains all of the terms by which the signer

intends to be bound." [35] Specifically, the statute reads: "When the law requires any writing to be signed by a party thereto, it shall not be deemed to be signed unless the signature is subscribed at the end of or close of the writing." A signature "in the middle of a writing [ ] gives no assurance that the contracting parties intend to be bound by matters which do not appear above their signatures." [36] However, the statute does not abolish incorporation by reference. [37]

 Incorporation by reference is an historic common-law doctrine. For a contract validly to incorporate other terms, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." [38] In addition, there must be "clear language [ ] express[ing] the incorporation of other terms and conditions[.]" [39] When this is the case and the signature follows afterward, "it is a logical inference that the signer agrees to be bound by everything incorporated." [40]

The Students claim that Kentucky law requires incorporating language "be conspicuous by being in larger or other contrasting type or color[,]" [41] but this misses the mark somewhat. *Hertz Comm. Leasing Corp. v. Joseph,* one of a series of cases relied on by the Students, dealt with implied warranties within UCC-governed transactions. Implied warranties are required to be "conspicuous," which the UCC defines; there is not, however, a similar principle for arbitration agreements or in-

**35.** *In re Brockman,* 451 B.R. 421, 426 (6th Cir. BAP 2011).

**36.** *Bartelt Aviation, Inc. v. Dry Lake Coal Co.,* 682 S.W.2d 796, 797 (Ky.App.1985).

**37.** See *Childers & Venters, Inc. v. Sowards,* 460 S.W.2d 343, 345 (Ky.1970)

**38.** 11 WILLISTON ON CONTRACTS § 30.25 (4th ed.2014) (compiling cases from various jurisdictions).

**39.** *Bartelt Aviation,* 682 S.W.2d at 797.

**40.** *Id.*

**41.** *Hertz Comm. Leasing Corp. v. Joseph,* 641 S.W.2d 753, 756 (Ky.App.1982); *see also Massey–Ferguson, Inc. v. F.X. Utley,* 439 S.W.2d 57 (Ky.1969).

corporating language in general. In fact, what we said in *Bartlett Aviation* rings equally true today: "[W]e know of no case law or statutes which require that incorporation language for [an] arbitration provision be stated in bold type or in any unusual form."[42] But that does not mean Daymar's incorporating language here is sufficient.

As we detailed earlier, the Agreement was slightly unorthodox. It consisted of one page, front and back, which in and of itself is not odd.[43] But toward the bottom of the first page was a paragraph, in plain type, ostensibly intended to incorporate other terms:

This Agreement *and any applicable amendments,* which are incorporated herein by reference, are the full and complete agreement between me and the College. By signing this Agreement, I confirm that no oral representations or guarantees about enrollment, academics, financial aid, or career/employment prospects have been made to me, and that I will not rely on any oral statements in deciding to sign this Agreement. My enrollment is not complete and this Agreement is not in effect until it is signed by an Authorized College Official.[44]

We are left to wonder what other terms Daymar may have been attempting to incorporate. Just below that paragraph was the following ostensible attempt at incorporation in all capitals:

___ I HAVE READ BOTH PAGES OF THIS STUDENT ENROLLMENT AGREEMENT BEFORE I SIGNED IT AND I RECEIVED A COPY OF IT AFTER I SIGNED IT.

In the blank space adjacent to the clause, students were to put their initials to signify they had indeed complied with the clause. Finally, just below that clause was the signature line on which the student and an authorized representative of Daymar signed.

■ Problems with Daymar's incorporation attempt are readily apparent. First of all, the only true incorporating language in the Agreement applies solely to "any applicable amendments." It is beyond dispute that the arbitration provision, an original term in the Agreement, cannot be an "applicable amendment." And no evidence has been brought to our attention that the Agreement was ever amended. Put simply, the one clear example of incorporating language in no way applies to the arbitration provision on the reverse side of the Agreement. This is troublesome for Daymar: the Agreement and any applicable amendments incorporated by reference constitute the full and complete agreement; but that does not apply to the terms on the reverse side because they are not amendments. The signature is at the bottom of the first page, before any of the terms on the reverse side, so the terms have not been made part of the Agreement at all under this provision.

■ For the arbitration provision to be binding on the Students, then, Daymar must rely solely on its provision indicating

---

42. *Bartelt Aviation,* 682 S.W.2d at 798.

43. It is worth mentioning that when the students were handed the Agreement, it was essentially three pages: a white copy, yellow copy, and pink copy. These pages were attached so that when the student signed the Agreement, the signature was carbon-transferred to the other copies. According to Daymar, this allowed the student immediately to have a copy to take home. At oral argument, Daymar acknowledged the signature line could have been placed on the back and accomplished the same goals. What Daymar does not mention, notably, is the likelihood of confusion associated with administering the Agreement in this manner.

44. Emphasis added.

that students have read "both pages" of the Agreement to save the arbitration provision. This provision is plagued by the absence of any language indicating that the Students actually assent to the terms referenced, not to mention any indication that any terms are actually being incorporated. Instead, the provision only indicates that the Students have *read* the terms. This situation is comparable to our proclamation in *Ally Cat, LLC v. Chauvin*: "Assent to be bound by the terms of an agreement must be expressed, and simply acknowledging the receipt of the document does not constitute assent to · be bound." [45] The Students' initials do not function as affirmation of assent but, rather, simple acknowledgement.

■ Daymar's choice of language immediately surrounding the "read" provision only bolsters our view that it was not intended to serve an incorporation function but, perhaps, only to bring awareness to the terms. The signature is required to be at the close of writing; but, of course, we allow terms to be incorporated as long as the incorporation language is above the signature. As we noted earlier, the provision immediately preceding the "read" provision ·contains clear incorporation language—obviously, if Daymar had wished plainly ·to incorporate the terms on the reverse side of the Agreement, it knew how to do ·so. But with the "read" provision, Daymar seemingly attempted to notify the Students that the Agreement continued past their signature, rather than incorporate the back-page language above

the signature. KRS 446.060 does not allow this—if it did, it would be rendered null. A multi-page contract could be drafted with "I HAVE READ ALL TERMS" at the top of the first page followed by the parties' signatures.[46]

In the end, Daymar's language is simply not clear enough to overcome KRS 446.060 and the requirement that parties show assent to be bound by terms of a contract. By resolving this case on these grounds, we do not need to reach the issues ·of procedural and substantive unconscionability.

### III. CONCLUSION.

It is by now axiomatic that arbitration agreements are matters of contract and they are to be treated on equal footing with all contracts. Today, we continue that principle. The incorporating language found in the Agreement was insufficient to show assent to arbitration and, more specifically, assent to arbitrate arbitrability. Accordingly, the Students who signed the Agreement essentially midway through the document were not bound by the arbitration provision on the reverse side of the Agreement. We reverse the Court of Appeals and remand the action to the trial court for further proceedings not inconsistent with this Opinion.

All sitting. All concur.

---

**45.** 274 S.W.3d 451, 456 (Ky.2009).

**46.** Admittedly, "[i]t is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud." *Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky.2011) (quoting *Clark v. Brewer*, 329

S.W.2d 384, 387 (Ky.1959)). This principle would seem to torpedo the Students' claim; but we find that this principle must be limited, in light of our law's subscription requirement, to the terms located *above* the signature line. Accordingly, we do not believe this principle dispositive of the Students' claim as the arbitration provision was *below* the signature.