NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0073n.06

Case No. 20-5671

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

FILED
Feb 04, 2021
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| BRASS REMINDERS CO., INC., | ) |
|     Plaintiff-Appellant, | ) |
| | ) |
|     v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR |
| RT ENGINEERING CORP., | ) THE EASTERN DISTRICT OF |
| | ) KENTUCKY |
|     Defendant-Appellee. | ) |
| | ) |

BEFORE: BOGGS, SUTTON, and NALBANDIAN, Circuit Judges.

BOGGS, Circuit Judge. This case concerns man and machine, miscommunication, and the doctrine of incorporation by reference. But above all, it concerns one man's failure to read the terms and conditions of his contract. Those terms required him to correctly specify variations on manufacturing materials, and he failed to do so. There is no genuine dispute that this failure was the ongoing and ultimate source of this contractual breach. Thus, the district court did not err in granting summary judgment against the suit by Brass Reminders, and we affirm.

## I. FACTS AND PROCEDURE

### A. Facts

Brent Durham, the president and co-owner of Brass Reminders, a Kentucky company, founded the company twenty-nine years ago. Named for its original mission to make engraved brass products, Durham shifted the company's focus to make—now almost exclusively—small

car decals sold in retail stores such as tourist shops and college bookstores. Until 2016, Brass Reminders had packaged its decals by hand. When done by humans, this is a simple task: Putting the decal in front of a cardboard "chipboard" (a piece of cardstock that provides rigidity to the package) to protect it from creasing, placing the decal into a small plastic bag, and stapling the package with a cardboard header card that also hangs the package on retail hooks.

In April 2016, Durham asked RT Engineering, a Massachusetts corporation, if it would build a custom machine to package his decals at five hundred units an hour. In May, RT sent Brass Reminders a price quote detailing the project and costs. The quote contains multiple pages along with a table of contents that lists many items, including "Item I," which is entitled "Customer Responsibility,"[1] and "Item P," which references RT's "Terms & Conditions." But instead of including the full text of the terms and conditions, Item P refers the reader to RT's website ("See our website for 2016 Terms & Conditions") and provides a hyperlink. The terms and conditions require the customer to provide the dimensional tolerances of the product that will be fed through RT's custom machines:

> Customer will be responsible for providing engineering drawings and sample parts during the design, debug, and testing phases of the project. Sample parts and documentation furnished will need to be a true and complete representation of the product to be processed with the Seller's equipment. Typical parts and tolerances or variations of the parts need to be identified. This will ensure that the Product is designed to accommodate the variances from part to part and to include the control features . . . . Specifically, dimensional tolerances of each product shall be provided

---

[1] The term "Customer Responsibility" is set out directly, not merely incorporated by reference:

> The customer is responsible for supplying all listed materials (if applicable) to RT prior to the due date. This date will be developed by the Project Manager and communicated to the customer far in advance of the on-site requirement. Failure to supply the services or materials listed may change the delivery date of your machine.

- Decal samples representing all sizes to be processed
- Chip board samples representing all sizes to be processed
- Header samples representing all product sizes

> along with all process specifications which will in any manner effect [sic] the performance of the Seller's equipment . . . . Failure on the part of the Customer to meet any of its responsibilities may lead to delays in RT Engineering's performance or Seller's inability to perform, for which RT Engineering will not be responsible.

On May 20, RT forwarded an invoice for $108,426 to Brass Reminders (approximately forty percent of the $279,083 quoted total price). Within days, Brass Reminders made the initial payment in a purchase order referencing the quote. The district court found that the contract was formed at the time Brass Reminders made the initial payment.

The remaining relevant facts span several years. In the main: The conflict involves Brass Reminders's and RT's miscommunication about the dimensional variations and consistency of the materials (decal, chipboard, plastic bag, and header card) that the machine was purposed to package. The sample materials that Brass Reminders supplied to RT during the initial design phase did not have significant variations, likely because they were of limited quantity and cut from the same batch of cardstock. RT believed this is why the early samples did not have significant variances. It was not until RT had nearly finished the machine and needed to test it on a large bulk of materials that it learned that the general run of materials had significant, and fatal, variations. These variations came from two primary sources: Brass Reminders's decision to save costs by shear-cutting its materials, as opposed to using the more precise die-cutting method, and its decision to store its materials in a non-climate-controlled warehouse. Throughout the machine project, different components presented different problems. While some problems were resolved, others remained a continued source of concern.

In June 2016, less than a month after contract formation, RT and Brass Reminders held an "on boarding" meeting. Before the meeting, RT sent Durham relevant documents. One of the documents, discussing the Factory Acceptance Test (the final live demonstration where the customer approves and accepts the product), stated: "Please supply the exact materials/product

that you will be running in the machine for [Factory Acceptance Test] . . . . Machine performance with material other than specified for it, that results in a failed acceptance test will be the customers [sic] responsibility."

After the on-boarding meeting, Durham signed a copy of RT's Customer Introduction Agenda. The signature page signed by Durham contains an acknowledgement that his signature represents "acceptance and approval of the process and delivery," as well as a specified acknowledgment of RT's terms and conditions. The terms and conditions were identified in bold immediately above (not below) the signature line.

Near the end of June, an RT engineer asked Durham to forward information needed to write the Functional Specification Document (FSD). The next day, Durham emailed RT the dimension specifications of the decal, chipboard and header-cards including the principal lengths and widths of "mini," "small," and "standard" size decals, as well as the various chipboard and header cards that Brass Reminders used. But the specifications only listed the principal sizes of each packaging piece used, not any tolerances or dimensional variances of those principal sizes. For example, Durham wrote that the "standard" decal size had a maximum of 36 square inches overall, with a length of 7.75" maximum and 1.5" minimum and a height of 5.75" maximum and 0.75" minimum. Durham then wrote below, "Decals will always be square or rectangular but can be ANY dimension subject to the above minimums and maximums." RT wrote the FSD based on the dimension specifications Durham provided, and Durham signed the FSD in July, which authorized RT to continue to develop the machine.

According to lead RT engineer Darren LaBonne, RT understood the dimension specifications to abide by the American Society of Mechanical Engineers (ASME) industry standard for how to write tolerances, and so it designed the machine accordingly. According to

RT, a figure written with a "two-place decimal point . . . indicates it is going to be plus or minus ten thousandths of the length" or height (or other dimension), and a figure written with one-place decimal point (e.g. 1.5") will be "plus or minus twenty thousandths" of the listed dimension. But RT would later learn, after the machine was nearly finished, that Durham was unaware of the ASME standards and that Brass Reminders's materials exceeded those tolerances.

In September, Durham reviewed and approved the design of the machine. RT began to test the machine at a higher capacity in December 2016. RT asked Durham to supply larger quantities of the materials for the December test, as well as for the Factory Acceptance Test scheduled for early the following year. Durham flew to Massachusetts to attend the December test in person. LaBonne testified, and Brass Reminders does not dispute, that until the December test, the materials Brass Reminders had supplied to RT "were a consistent thickness." Previously, Brass Reminders had supplied RT a relatively small quantity of sample materials. RT relied on these samples for the design of the machine. It was not until RT needed larger quantities of materials to test the machine's high-output capacity that RT noticed variations in the materials that hampered machine performance.

In late February 2017, RT emailed Durham and told him that "some of the parts" Durham brought in December and shipped after "have issues the machine cannot process. If the chip board [sic] are severely bowed they will not feed through the friction feeders. Also we noticed that the board materials vary and the print quality suffers. Some of the boards are more porous and absorb the ink." RT emailed Durham again in March, writing that "We have been dealing with material issues right along and it is really slowing progress down . . . . We need to be able to get these issues corrected in order to be able to cycle the machine at the output rate desired." RT also requested a

call with Durham to discuss how to fix the issues. Durham responded, noting that he was aware of product variances and that the curling issue was because of humid storage conditions:

> I spoke with our die cutter regarding the issues we discussed today. 1. He said, yes we get all gauges of material because we do not specify and they run whatever is convenient. This was fine for hand packaging, and we went that way to get the lowest cost. It is not a problem to always use the same material for us and give us consistent thickness going forth. I asked what that thickness is and he was not sure, will be getting back to me on. 2. Regarding curl, he seems to think that the material is "very flat" coming off his equipment, and that the problem is that we [Brass] store it in a non-climate controlled warehouse for up to 2-3 months. He says it is very susceptible to humidity and that we can solve the problem by storing it at 50% humidity . . . I discussed getting frequent deliveries of small quantities, which he says he can do. I'm sure my bill will go up for that . . . .

March 23, 2017, email from Durham.

Durham testified that he expected RT to resolve the problems with the variations in the materials because "[t]he product was no different than the product that was submitted to them at the beginning of the process." Brass Reminders had its "die cutter," Jourdan Graphic Services, specially shear cut material of the same thickness and sent the new batch to RT. These materials fed through the machine without error. But when Brass Reminders sent another batch for the June Factory Acceptance Test, the materials again varied and slowed the machine during the Acceptance Test. Durham ignored RT's recommendation for him to spend an additional $1,500 to buy equipment to remove the humidity-induced static that was one of the problems slowing the machine. Through the summer and in the fall of 2017, RT tweaked the machine to resolve issues from the Acceptance Test, but it could not fix the machine to accommodate the wide variation in Brass Reminders's materials. When RT informed Durham that "[d]owntime related to product variation or product inconsistency will not be counted against the 500 piece run rate," Durham testified that he never agreed to that because Brass Reminders's product "never changed." But

Durham admitted in the same deposition that Brass Reminders's product did vary. Durham's deposition appears contradictory:

> Q. The second page of Exhibit 34, the response from RT Engineering about humidity is, "In terms of the humidity, if the chipboards bow or out of dimensional spec and do not feed properly, this is something RT can't control and can't be counted against throughput."
>
> A. I respectfully disagree with that. There were no dimensional specs on the—on the thing other than just the size of the cardstock. And, really, we didn't even put a spec on that. You know, they knew what they had to create a machine to feed. And they did not create a machine to feed. And they did not create a machine that could feed them. So it does count against rated time. . . . I never agreed to a spec on a cardstock.
>
> Q. You never agreed to provide specifications on your products for RT Engineering . . . to design the machine? . . .
>
> A. Other than the specs that we provided, it was part of one of your attachments that said these were the decal size, can be this long—you know, anywhere from this long to this long, this short to this short. I forget what attachment it was, but we did go over it. So I did provide specifications on the size of the product. I listed the nominal size of the cardstocks that would be used and—and those are sheered [sic] within probably five to six thousandths of an inch, you know, but there is variation on the sizes there.

In November 2017, RT requested that Brass Reminders send a new batch of materials for another machine test. Brass Reminders did not respond until RT asked again in January 2018. Brass Reminders sent a partial shipment of materials the next day and another batch in mid-February. After running the machine successfully using these new materials, RT Engineering emailed Durham a video of the machine running and wrote: "What we have found is that the machine will run fine when the [Brass Reminders] product is not bent, stuck together or oversize/undersize. RT feels confident the machine will run consistently if good product is used." Durham did not respond until RT Engineering followed up over a week later. On March 2, Durham wrote that while "[t]he video was promising," he expressed frustration that the project was "now about 1.5 years late." Durham also wrote that "should the machine fail this time, I will ask for a full refund of all monies paid and cancel the order. It needs to work this time . . . so that it takes a

'perfect storm' to stop the machine, not a perfect storm for it to run." On March 7, RT responded that the machine would work so long as it was not fed "bad product that the machine was not designed to handle: 1. Product that stick together either by static or poor slitting; 2. Product that is curled." RT's email also provided variance specifications that either increased the tolerances from the original Functional Specification Document (to better accommodate the variations in Brass Reminders's materials) or added tolerances for parameters that Durham had never given (e.g. decal thickness, static-induced curling). RT thought it was helping Brass Reminders by modifying the tolerances and adding new specifications. But Durham took umbrage at the changes and grew suspicious, handwriting on a printed copy of RT's email, "They are now specifying tolerances for parts. Trying to get machine to pass test, but it has to <u>run our parts</u>, not an artificial set of specifications they created." (emphasis in original).

Ahead of the second Factory Acceptance Test scheduled for May 2018, Brass Reminders shipped RT a new batch of material to feed through the machine during the Acceptance Test. In April, RT notified Durham by email that, although the chipboards were fine, the decals had significant variances that would present problems for the machine. In particular, the decals were bent and bowed, even beyond the new tolerances RT had set to accommodate this issue. RT attached pictures of the problem. Durham responded:

> The slight curve is the way these are, and they cannot be changed. Your job was to design a machine that can insert them. If the current design won't do the job, you will have to change the machine so it will. . . . If the machine does not do these jobs flawlessly after 2 years of having my money tied up we will request a full refund.

RT responded that "the machine was designed and built based on samples that were not curved to the extreme we have seen." RT assured Durham that it would "sort and straiten [sic] [the material] to the best of our ability" but asked Durham to bring more consistent materials to the Factory Acceptance Test.

The Factory Acceptance Test in May 2018 did not go well. The machine jammed and Durham therefore refused delivery of the machine. RT believed that the jamming occurred, yet again, because of Brass Reminders's inconsistent materials. In the aftermath of the failed Acceptance Test, Durham emailed cutter Jourdan Graphic Services and acknowledged that the materials caused the jamming: "[A]t the last trial, variation in the size of the backer cards from shearing became an issue. We need to look at die cutting the backer cards for consistency." In an email to RT in June, Durham wrote that RT engineer "Darren [LaBonne] was saying the looseness of tolerance on a sheared product was causing him problems and he was suggesting having the cards die cut . . . . I think the expense of that would be prohibitive."

RT proposed that it would purchase, at its own cost, die-cut materials from Brass Reminders's vendor "to prove that there was nothing wrong with the machine." But Durham ordered his vendor not to sell die-cut materials to RT because, as Durham testified, "I didn't want the machine to prove itself out on something that we couldn't continue to use. It had to prove itself on the stock that we could afford to use." In an email to RT in June, Durham again acknowledged that "consistency" of the materials was an "issue" and said that Brass Reminders "did not specify tolerances [at the outset of the project] because it simply did not matter to us" when it had hand-packaged the decals. Brass Reminders sent RT a new set of sheared materials in July. Brass Reminders's cutter told Durham that he would endeavor to shear-cut the materials as close to the dimensional tolerances as possible. RT received the materials in July but misplaced them and did not respond until Brass Reminders's email message in November, cancelling the project and demanding a full refund because "RT is not capable of producing a machine to meet the agreed on specifications[.]" RT's president responded, apologizing for misplacing the materials, and offered to forego the final balance of $40,659.75 "due to the significant delay." RT also asked for the

opportunity to test the misplaced materials. Apparently, Durham rejected this proposal, and Brass Reminders filed suit. The suit sought a refund of all the money it has paid to RT, and damages.

## B. Procedure

Brass Reminders filed its complaint in Kentucky state court on April 29, 2019. RT removed the case to federal district court on June 6, 2019. After discovery, RT moved for summary judgment on Brass Reminders's claims and its own counterclaim for breach of contract, and the district court granted summary judgment in favor of RT.

## II. ANALYSIS

## A. Standard of Review

We review the district court's grant of summary judgment de novo. *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012). A federal court must grant summary judgment if, viewing the facts in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986).

## B. The Terms and Conditions Were Incorporated by Reference

Neither party disputes the district court's determination that a contract was formed when Brass Reminders accepted RT's offer (the quote) by paying RT the required "40% due with placement of the order." But Brass Reminders argues that RT's hyperlinked terms and conditions were not incorporated by reference into their contract. That is the chief question of the case. If the terms were incorporated, Brass Reminders breached its contract. The district court held that the terms and conditions were properly incorporated by reference. We agree.

We apply Kentucky law. The lower court determined that Kentucky law applies to the incorporation question and neither party disputes that determination on appeal. Brass Reminders relies on *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332 (Ky. 2015), to argue that RT's

terms and conditions were not incorporated by reference into the contract because RT "cannot prove express assent by Brass Reminders to be bound" to those terms. *Dixon*, however, has significant differences from this case.

In *Dixon*, the Kentucky Supreme Court held that a for-profit university's arbitration clause placed on the back of the "Student Enrollment Agreement" contract was not a valid part of the contract. Because the arbitration clause came after the signature line, it could only become part of the contract if some language before the signature line incorporated the clause. 483 S.W.3d at 345–46; Ky. Rev. Stat. § 446.060(1). The court found that the contract failed to incorporate the arbitration clause because the text of the student-enrollment agreement merely asked students to acknowledge that they "read both pages of" and "received a copy of" the enrollment agreement. *Id*. at 346. "Assent to be bound by the terms of an agreement must be expressed, and simply acknowledging the receipt of the document does not constitute assent to be bound." *Ibid* (quoting *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 456 (Ky. 2009)). And the only "true incorporating language in the Agreement" applied only to "any applicable amendment," a category that did not include the arbitration clause. *Id*. at 345.

Much of *Dixon*'s analysis, which concerns the language and location of the arbitration clause after the signature line, does not provide an immediate answer here. Although Durham did sign the Customer Introduction Agenda (which referenced the terms and conditions) and the Functional Specification Document, the district court found that the contract was formed earlier, without Durham's signature, when Brass Reminders placed its order and paid RT forty percent of the total price listed in RT's quote.

Yet despite these differences, *Dixon* provides general guidance: "[I]t must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Id*. at 344

(quoting 11 *Williston on Contracts* § 30.25 (4th ed. 2014)). Further, "there must be 'clear language expressing the incorporation of other terms and conditions.'" *Ibid.* (alterations removed) (quoting *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 797 (Ky. Ct. App. 1985)). The parties dispute whether Brass Reminders had knowledge of, and assented to, the incorporated terms and conditions, and that clear language incorporated the terms and conditions.

Unlike in *Dixon*, here there is no misleading language. The quote, for example, did not ask Durham to merely *acknowledge receipt* of the terms and conditions, as the student enrollment agreement did in *Dixon*. The terms and conditions are listed in the quote as "Item P," along with other alphabetized items that both parties agree are binding contract terms. The terms and conditions are not referenced in any appendix or supplemental document, but in the quote's table of contents and at the end of the quote. This provided the required clear language of incorporation and notice that the contract in *Dixon* lacked.

A more recent Kentucky Supreme Court case involving a contested arbitration clause emphasized the importance of notice in determining questions of incorporated terms: "[A] person is presumed to know those things which reasonable diligence on his part would bring to his attention." *LP Louisville East, LLC v. Patton*, 605 S.W.3d 300, 315 (Ky. 2020). Describing "well settled principles of contract law," *Patton* quoted an earlier case:

> It is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud.

*Ibid.* (quoting *Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011)).

To be sure, this case does not involve a signed contract. But that does not alter the applicability of *Patton*'s logic or the principles of well-settled contract law: Notice of a contract's terms is presumed when a person has the opportunity to read the contract and accepts the contract

offer. A party cannot abrogate the terms it dislikes after the fact, unless terms are misleading, as they were in *Dixon*. There is no dispute that Brass Reminders accepted the contract. The language of the quote was not misleading. The presumption that Durham and Brass Reminders knew the terms and conditions of the contract applies. The terms and conditions were plainly listed in the quote, and a hyperlink to them was provided. Reasonable diligence required that Durham or one of his employees click the hyperlink (or ask RT for a hard copy) and read the terms and conditions. Unlike the students in *Dixon*, Durham is a reasonably sophisticated businessman who has run a successful company for decades. He even told RT Engineering that he had some familiarity in ordering automated machine equipment.[2] Engineer LaBonne testified that Durham represented that "he knew about automation and tolerancing and dimensioning" that would be necessary for the design of the machine.

Further, there is no allegation that RT in any way attempted to deceive Brass Reminders about the terms and conditions, or that the terms and conditions were in any way concealed from Durham's consideration. Rather, Durham admits he did not read the terms and conditions because he did not want to read them. He testified in his deposition that he viewed many of the details of the quote as "minutiae" that he "[did not] care" about, and that he reviewed only "the parts that I felt were germane to me." He testified that he did not look up RT's terms and conditions: "I probably didn't notice that at the time. . . . I don't think I went to that website. . . . I remember skipping in the airport to the part of here's the price; here's how long it's going to take and probably never read all of this."

---

[2] "I'm somewhat familiar with automation. About 20 years ago I sold industrial metals. Several of my clients did automation work. I specced out and purchased a lights-out running LSR mold, but never ordered custom automation equipment."

Durham was given further notice of the terms and conditions when he signed RT's Customer Introduction Agenda after the "on boarding" meeting in June 2016. *See Cent. Adjustment Bureau, Inc. v. Ingram Assocs., Inc.*, 622 S.W.2d 681, 686 (Ky. Ct. App. 1981) ("By signing the covenants and continuing their employment . . . [the individuals] must be deemed to have assented to be bound by them. They cannot be heard to deny their validity."). The terms and conditions were explicitly referenced directly above the Customer Introduction Agenda's signature line. This was the second time an RT document referenced the terms and conditions (they were first referenced in the quote), and the second time Durham failed to question or object to them. This suggests he knew he agreed to the terms and conditions at formation. We need not determine if Durham "ratified" the contract through this subsequent signing. What matters is that Durham again had notice of the terms and conditions and had notice early in the process. The agenda explicitly referred, in bold, to the terms and conditions directly above the signature line, noting that "[a] copy [of] [t]he T&C's for RT Engineering are [sic] available for review on our website." Not once did Durham inquire about the terms and conditions.

Therefore, the terms and conditions were incorporated by reference and became part of the parties' agreement.

### C.  Brass Reminders Breached Its Contract with RT Engineering

The lower court determined that Massachusetts law applies to the breach-of-contract issue and neither party disputes that determination on appeal.

Brass Reminders argues that it did not breach the contract and that the district court granted summary judgment in error because there is a genuine issue of material fact as to whether the materials it provided to RT Engineering contained "variances." The record does not demonstrate a genuine dispute of material fact. Even after viewing the facts in the light most favorable to Brass

Reminders, the undisputed record leaves no doubt that variations in Brass Reminders's materials caused ongoing problems with the machine. Therefore, Brass Reminders breached its obligation under the contract.

Brass Reminders contends that "the Dimension Specifications provided by Brass Reminders early in the relationship with RTE clearly set out the range of sizes of its decal product (i.e., tolerances) that RTE's machine was contracted to package." But this is contradicted by Durham's testimony. He said he listed the "nominal size of the cardstocks that would be used . . . but there is variation on the sizes there." Durham also testified, "There were no dimensional specs on the—on the thing other than just the size of the cardstock. And, really, we didn't even put a spec on that."

Brass Reminders emphasizes that the dimensions listed for the decals (not the other materials) said that they "will always be square or rectangular but can be ANY dimension subject to the above minimums and maximums." But the internal decal size-ranges Brass Reminders describes were not a source of machine error. A persistent problem was that the decals bent and bowed, causing the machine to slow or jam. Brass Reminders did not specify curvature as a variability in its original dimension specification, nor did it specify the thickness of its cardstock. Durham also acknowledged in an email to RT that the curling of the materials came from storing them in Brass Reminders's non-climate-controlled warehouse.

Another problem was that the materials exceeded the original tolerances Brass Reminders had provided. As discussed, a significant point of miscommunication was that RT understood Brass Reminders's dimension specifications to use the ASME industry standard for tolerances even though Durham had no such intention and only intended to write the principal dimensions of the materials. But the terms and conditions required that Brass Reminders provide "dimensional

tolerances of each product . . . along with all process specifications which will *in any manner effect* [sic] *the performance of the Seller's equipment . . . .*" (emphasis added).

Brass Reminders also asserts that "it is quite apparent that the District Court and RTE confuse the Brass Reminders product for which the Dimension Specifications were provided—the novelty decal—with other packaging materials (plastic bags, header cards and 'chipboard' backer cards)." But the header cards and chipboard cards also caused problems with the machine. For example, Durham acknowledged in his email to his cutter that, "at the last trial variation in the size of the backer cards from shearing became an issue. We need to look at die cutting the backer cards for consistency." RT initially did not know the materials were shear-cut (and instead believed they were die-cut) because Durham "constantly" referred to his shear-cutter as his "die cutter."

Brass Reminders argues that Durham's testimony "regarding the product samples provided throughout the relationship with RTE" is "consistent and clear." Brass Reminders cites the following excerpts of Durham's deposition:

> I don't feel like there's been any variability in our product. The product that I gave them as samples is the product I have today. It can't change. It is what it is. That's the product they had to package.
>
> [I]t's the same material that we provided at the quote.
>
> The product was no different than the product that was submitted to them at the beginning of the process.
>
> I cannot change what the product is. The product is the product.

Reading these carefully selected quotes in context, however, shows that Durham uses the term "variability" in different ways throughout his deposition and communications. At one level of generality, Brass Reminders supplied RT the "same" product, in that the principal dimensions of the materials did not change (though the tolerances did) and in that Brass Reminders used the same cutter and material sources as it had in the past. But at a more specific level, the level that affected the machine, Durham admitted that the product had variations. For example, "variation in

the size of the backer cards from shearing became an issue." In an email to RT, Durham acknowledged that, as his cutter told him, "we get all gauges of material because we do not specify and they run whatever is convenient. This was fine for hand packaging, and we went that way to get the lowest cost. It is not a problem to always use the same material for us and give us consistent thickness going forth." Durham admitted that even though he did "provide specifications on the size of the product. I listed the nominal size of the cardstocks that would be used . . . but there is variation on the sizes there." Durham also admitted that the product was variable in the samples Brass Reminders provided.

Brass Reminders was required under the terms and conditions to specify the dimensional variations that would affect the machine. There is no genuine dispute of material fact that it failed to do so and failed to provide consistent materials to RT Engineering. Thus, the district court properly found that Brass Reminders breached the contract, and so its claim against RT for breach of contract failed. To the extent that Brass Reminders also challenges the district court's ruling on RT's counterclaim for breach of contract, that argument fails in light of Brass Reminders's own breach. Summary judgment for defendant RT was properly granted.

## III. CONCLUSION

For these reasons, we AFFIRM.