Rule 23 order filed
September 6, 2018;
Motion to publish granted
October 5, 2018.

2018 IL App (5th) 180214

NO. 5-18-0214

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| JUNE M. WARD, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Randolph County. |
| | ) | |
| v. | ) | No. 16-L-27 |
| | ) | |
| J.J.B. HILLIARD; W.L. LYONS, LLC, d/b/a | ) | |
| Hilliard Lyons, a Kentucky Corporation; and | ) | |
| MICHAEL BARNETT, | ) | Honorable |
| | ) | Thomas B. Cannady, |
| Defendants-Appellants. | ) | Judge, presiding. |

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Justices Welch and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1 This case is before us on an interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), from an order of the circuit court denying the defendants' motion to dismiss the plaintiff's complaint or, alternatively, to stay the lower court proceedings pending mandatory arbitration. The appeal stems from a complaint filed by the plaintiff, June M. Ward, in which she alleged that the defendants, J.J.B. Hilliard, W.L. Lyons, LLC d/b/a Hilliard Lyons (Hilliard Lyons), and Michael Barnett, were negligent in the management of her individual retirement account (IRA). The appeal centers on the issue of whether the parties' contract concerning the management of the IRA included an agreement to arbitrate disputes stemming from the contract. The defendants filed the motion seeking the dismissal or stay, alleging that their agreement required

1

arbitration of the dispute. The circuit court, however, denied the defendants' request, holding that, under Kentucky law, the parties' agreement did not include an enforceable arbitration provision. The defendants now appeal from this interlocutory order. For the following reasons, we reverse and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     Hilliard Lyons is a Kentucky corporation engaged in the business of providing its customers investment management services, including the management of IRAs. It has a branch office in Marion, Illinois. In the spring of 2015, the plaintiff's husband, Archie Ward, came to Hilliard Lyons' Marion office and met with Barnett to open separate IRA accounts for himself and the plaintiff. Barnett provided Ward with two sets of documents, one set for Ward and one set for the plaintiff, in connection with opening the IRA accounts. The sets of documents included an account application and an "Account Terms of Service." Incorporated into the account application were (1) an individual retirement custodial account agreement and (2) disclosure statements. Therefore, the account application, individual retirement custodial account agreement, and the disclosure statements were all part of a single, 14-page document. A line for the account holder's signature appears on page four of this document.

¶ 4     The Account Terms of Service is a separate document and has no space for the account holder's signature or initials. In an affidavit attached to the defendants' motion to dismiss or stay, Barnett testified that after his meeting with Ward, he subsequently spoke with the plaintiff over the telephone and confirmed that she had received both of these documents.

¶ 5     On June 3, 2015, the plaintiff completed and signed the account application. Hilliard Lyons subsequently opened an IRA account on her behalf, and the defendants began managing the account.

On December 6, 2016, the plaintiff filed her complaint against the defendants alleging that they were negligent and breached their fiduciary duties in managing the account.

¶ 6    The defendants subsequently filed the motion to dismiss or stay, which is the subject matter of the present appeal. In their motion, the defendants maintained that their agreement with the plaintiff included a provision that required them to arbitrate disputes. In her response, the plaintiff denied that she agreed to arbitrate any disputes.

¶ 7    As explained above, the only document that the plaintiff signed was page 4 of the 14-page account application. The first four pages of the account application required the plaintiff to answer various financial-related questions on topics that included income, net worth, investment goals, beneficiary designations, and other account-related matters. Immediately above the plaintiff's signature at the bottom of page four is the following: "The undersigned hereby accepts the Hilliard Lyons Retirement Account Custodial Agreement." Following the plaintiff's signature, pages five through eight of the document set out the terms of the "INDIVIDUAL RETIREMENT CUSTODIAL ACCOUNT AGREEMENT." The terms of the retirement custodial account agreement do not include any reference to arbitration. Pages 9 through 14 of the account application include a "DISCLOSURE STATEMENT" and a "FINANCIAL DISCLOSURE." Again, neither of these disclosures mentions arbitration.

¶ 8    The defendants' argument that the plaintiff agreed to arbitrate is based on an acknowledgement on the account application, above the plaintiff's signature, that reads as follows: "By signing this application, I acknowledge that I understand and have received a copy of the Account Terms of Service, which, in Sections 13 and 14, require arbitration to resolve disputes."

¶ 9    As stated above, the Account Terms of Service is a separate four-page document that Barnett furnished to the plaintiff along with the account application. The plaintiff's signature does not appear

3

on this document, as the document itself does not have any lines for signatures. At the outset, the language of the Account Terms of Service states that Hilliard Lyons agreed to open and maintain "one or more investment accounts" and "[i]n exchange, you [the plaintiff] agree[d] to the following terms of service." It then further states, "We wish this could be shorter, but many of these terms are prescribed by law. You should read and agree to them in addition to the terms of service specific to the account(s) you are opening."

¶ 10    As referenced in the acknowledgement above the plaintiff's signature on the account application, paragraphs 13 and 14 of the Account Terms of Service require arbitration as follows:

"13. ARBITRATION GENERALLY: When you open an account with us, any disputes between you and us will be settled by arbitration rather than by going to court. Here is how arbitration in our industry works:

(a) You and we give up the right to sue each other in court, including the right to a trial by jury, except as provided by the Code of Arbitration Procedure for Customer Disputes of the Financial Industry Regulatory Authority (FINRA; below, the code is referred to as 'FINRA's Code').

(b) We are incorporating FINRA's Code and any future amendments to it into these Terms of Service as if they were set out in full. See *www.finra.org/ArbitrationAndMediation* for an overview of FINRA's Code and arbitration process.

(c) FINRA's Code requires a party to bring a claim for arbitration within six years after the event giving rise to the dispute occurred. In some cases, a claim not eligible for arbitration can be brought in court.

4

(d) You can choose an all-public panel or a majority-public panel of arbitrators. (A 'majority public' panel will have one arbitrator who participates in the financial services industry, one non-industry chairperson, and one non-industry arbitrator.)

(e) Your and our ability to obtain documents, to get statements from witnesses, and to conduct other discovery is more limited in arbitration than in court proceedings.

(f) Arbitrators do not have to explain the reasons for their award unless you and we submit to them a joint request for an 'explained' decision at least 20 calendar days before the first scheduled hearing date.

(g) Arbitration awards are final and binding. Courts will normally enforce them. Your and our ability to have a court reverse or modify an arbitration award is very limited.

14. MANDATORY ARBITRATION: You agree to arbitrate all controversies that may arise between us and our agents, representatives, affiliates, or employees on the one hand and you on the other hand concerning any transaction or the construction, performance, or breach of any agreement between us, whenever that transaction or agreement was or is entered into. Arbitration will be conducted before FINRA under FINRA's Code. The arbitrators' award will be final, and a party can enter judgment on the award in any federal or state court that has jurisdiction."

¶ 11    The circuit court conducted a hearing on the defendants' motion to dismiss or stay, and on March 7, 2018, it denied the motion. Applying Kentucky contract law, the court concluded that the Account Terms of Service was not incorporated into the parties' agreement by reference. The court

5

stated: "The Application language drafted by Defendant Hilliard Lyons fails to show that Plaintiff assented to be bound by the Account Terms of Service, including the arbitration clause. Furthermore, it fails to incorporate by reference the Account Terms of Service into the Account Application." The court emphasized that the account application did not include language that the plaintiff "actually assents" to the Account Terms of Service but, instead, "merely acknowledges receipt of the terms." The circuit court held that, under Kentucky law, assent to be bound by the terms of an agreement must be express, and simply acknowledging the receipt of the document does not constitute assent to be bound.

¶ 12     The circuit court also held that the Account Terms of Service, as a stand-alone document, violated Kentucky's statute of frauds because it was not signed by the plaintiff and could not be performed within one year. The court found that the clear intent of the parties was that "the agreement or investment and brokerage services would not, and could not, be completed within one year." Therefore, the court concluded that it must be signed in order to be enforceable as a stand-alone agreement.

¶ 13     The defendants now appeal from the circuit court's interlocutory order.

¶ 14                                    II. ANALYSIS

¶ 15                              A. Appellate Jurisdiction

¶ 16     This appeal is brought pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), which allows for the appeal of an interlocutory order that grants, modifies, refuses, dissolves, or refuses to dissolve an injunction. The supreme court has held that "[a]n order of the circuit court to compel or stay arbitration is injunctive in nature and subject to interlocutory appeal under paragraph (a)(1) of [Rule 307]." *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11 (2001). Therefore, we have jurisdiction over

this interlocutory appeal pursuant to Rule 307(a)(1). *Fahlstrom v. Jones*, 2011 IL App (1st) 103318, ¶ 3 (order refusing to compel arbitration is the equivalent of order denying an injunction).

¶ 17                               B. Choice of Law

¶ 18    "When deciding whether the parties agreed to arbitrate a certain matter ***, courts generally *** should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In the present case, the parties agree that their dispute concerning whether there is an agreement to arbitrate is controlled by Kentucky contract law. The individual retirement custodial account agreement attached to the account application (pages five through eight) states: the agreement "is subject to all applicable federal and state laws and regulations. If it is necessary to apply any state law to interpret and administer this agreement, the law of our domicile will govern." Because Hilliard Lyons is a Kentucky corporation, the circuit court applied Kentucky law in determining whether the parties had an agreement to arbitrate. On appeal, neither party takes issue with this aspect of the circuit court's decision. Accordingly, we will also apply Kentucky law as it relates to the validity of the purported agreement to arbitrate. See *B.H. Smith, Inc. v. Zurich Insurance Co.*, 285 Ill. App. 3d 536, 538 (1996) ("Choice of law is not an issue before us on appeal. The parties agree that New York law governs this dispute. Therefore, we apply New York law to resolve this appeal.").

¶ 19                               C. Standard of Review

¶ 20    Arbitration is a matter of contract; the plaintiff cannot be forced to submit to arbitration of any dispute that she has not agreed to arbitrate. *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 600 (Ky. 2012); *JPMorgan Chase Bank, N.A. v. Bluegrass Powerboats*, 424 S.W.3d 902, 907 (Ky. 2014) ("Before a court can order a case to arbitration, it must first find that there is a valid, binding arbitration agreement."). The existence of an agreement between the parties depends on state law

7

rules of contract formation. *Ping*, 376 S.W.3d at 590. Under Kentucky law, the issue of contract formation is a question of law that is reviewed *de novo*. *Baumann Paper Co. v. Holland*, 2016-SC-000511-DG, slip op. at 4 (Ky. June 14, 2018). We also note that, in making its ruling, the circuit court considered only the pleadings and attached documents, deciding the issue as a matter of law. Under such circumstances, under Illinois law, our review of the court's decision is *de novo*. *Board of Managers of Chestnut Hills Condominium Ass'n v. Pasquinelli, Inc.*, 354 Ill. App. 3d 749, 753-54 (2004).

¶ 21                                    D. Agreement to Arbitrate

¶ 22    Our task is to analyze the language of the parties' written agreement under Kentucky's contract formation principles and determine whether the plaintiff agreed to the arbitration clauses in the Account Terms of Service. We believe that the framework for our analysis was set out in detail by the Kentucky Supreme Court in *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332 (Ky. 2015), where the supreme court applied Kentucky contract law, specifically the incorporation by reference doctrine, to determine whether an arbitration clause was incorporated into the terms of a contract by reference.

¶ 23    In *Dixon*, students filed a lawsuit against a for-profit college alleging various claims relating to the college's admissions process. *Id*. at 336. During the college's admissions process, prospective students signed a document called a student enrollment agreement. The agreement was a single-page document with provisions on the front and back; the students signed only the front. *Id*. The agreement included information such as the program for which the student was registering, credit hours, estimation of time to complete the program, and an estimation of cost of tuition, books, and fees. *Id*. at 337.

8

¶ 24    The arbitration clause at issue in that case was located on the reverse side of the enrollment agreement, and it stated that any disputes arising from enrollment in the college would be resolved by arbitration. *Id*. The college moved to dismiss the students' lawsuit and compel arbitration based on this arbitration clause. *Id*. at 336. The lower court, however, denied the motion and declined to compel arbitration, holding that the arbitration clause was unenforceable. *Id.* at 335. On appeal, the Kentucky Supreme Court addressed the issue of whether the arbitration clause on the reverse side of the contract was incorporated into the parties' enrollment agreement by reference on the front side of the contract above the students' signatures. *Id*.

¶ 25    In its analysis, the *Dixon* court first looked at Kentucky's statute of frauds, which requires contracts " 'not to be performed within one year from the making thereof' " to be signed and in writing. *Id*. at 343 (quoting Ky. Rev. Stat. Ann. § 371.010(7) (West 2014)). The college argued that the statute of frauds did not apply because, under the enrollment agreement, a student could leave at the end of an academic term, which was less than one year. The *Dixon* court, however, focused on the parties' intent with respect to the contract's duration. *Id*. The court noted that "it [was] impossible for a student enrolling in [the college] to complete the program and obtain a degree within a year." *Id*. The court stated, "It is clear to this Court that when the Students signed the Agreement, they contemplated an obligation that could not be performed within a year." *Id.* at 344. The court, therefore, concluded that Kentucky's statute of frauds applied. *Id*.

¶ 26    Because the statute of frauds applied, the court then turned to the language of Kentucky Revised Statute (KRS) 446.060, which provides: "When the law requires any writing to be signed by a party thereto, it shall not be deemed to be signed unless the signature is subscribed at the end or close of the writing." Ky. Rev. Stat. Ann. § 446.060(1) (West 2014). This statute promotes the "principle that when a signature is placed at the end of an agreement, there is a logical inference that

9

the document contains all of the terms by which the signer intends to be bound." *In re Brockman*, 451 B.R. 421, 426 (B.A.P. 6th Cir. 2011). "When the signature is in the middle of a writing, it gives no assurance that the contracting parties intend to be bound by matters which do not appear above their signatures \*\*\*." *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 797 (Ky. Ct. App. 1985).

¶ 27    In *Dixon*, the purported arbitration agreement between the parties was on the backside of the enrollment agreement, but the students' signatures were at the bottom of the front side of the document. The *Dixon* court, therefore, held that the arbitration clause did not comply with the requirements of KRS 446.060 because the clause was located after the students' signatures. This did not end the court's analysis, however, because the court held that KRS 446.060 did not abolish the common law doctrine of "incorporation by reference." *Dixon*, 483 S.W.3d at 344. Therefore, the court analyzed the parties' agreement to determine whether the arbitration clause was sufficiently incorporated into the enrollment agreement, above the students' signatures, by reference. *Id*.

¶ 28    The *Dixon* court explained that, in order for a contract to validly incorporate other terms by reference, " 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.' " *Id*. (quoting 11 Williston on Contracts § 30.25 (4th ed. 2014)). "[W]hen a signature is placed after clear language has expressed the incorporation of other terms and conditions by reference, it is a logical inference that the signer agrees to be bound by everything incorporated." *Bartelt Aviation, Inc.*, 682 S.W.2d at 797.

¶ 29    In analyzing the agreement in that case, the *Dixon* court first noted that the enrollment agreement included the following language above the students' signatures: " 'This Agreement *and any applicable amendments*, which are incorporated herein by reference, are the full and complete agreement between me and the College.' " (Emphasis in original.) *Dixon*, 483 S.W.3d at 345. Just

10

below that paragraph, each student placed his or her initials next to the following acknowledgment: " 'I have read both pages of this student enrollment agreement before I signed it and I received a copy of it after I signed it.' " *Id*.

¶ 30 The *Dixon* court first looked at the paragraph referencing "applicable amendments" and concluded that the arbitration clause on the reverse side of the document was not an "applicable amendment." The court stated, "[N]o evidence has been brought to [the court's] attention that the Agreement was ever amended." *Id*. Therefore, the court concluded, this language did not incorporate the arbitration clause into the parties' agreement by reference. *Id.*

¶ 31 Next, the court looked at the language of the acknowledgment that each student initialed that indicated that the students had read " 'both pages' " of the agreement. *Id*. at 345-46. The court stated that this acknowledgment was "plagued by the absence of any language indicating that the Students actually assent to the terms referenced, not to mention any indication that any terms are actually being incorporated." *Id*. at 346. "Instead," the *Dixon* court continued, "the provision only indicates that the Students have *read* the terms." (Emphasis in original.) *Id*. The court cited *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 456 (Ky. 2009), where the court stated, "Assent to be bound by the terms of the agreement must be expressed, and simply acknowledging the receipt of the document does not constitute assent to be bound."

¶ 32 The *Dixon* court concluded that the students' initials next to the acknowledgment did not function as affirmation of assent but was merely an acknowledgment that was "not clear enough to overcome KRS 446.060 and the requirement that parties show assent to be bound by terms of a contract." *Dixon*, 483 S.W.2d at 346. Accordingly, the court held that the arbitration clause on the reverse side of the enrollment agreement was not incorporated into the parties' agreement by reference and was not enforceable.

11

¶ 33    In the present case, in analyzing whether the parties agreed to arbitration under Kentucky law, we will follow the analysis framework set out by the *Dixon* court. Therefore, like the court in *Dixon*, we first begin our analysis with Kentucky's statute of frauds. KRS 371.010(7) sets out the state's statute of frauds as follows: "No action shall be brought to charge any person *** [u]pon any agreement that is not to be performed within one year from the making thereof *** unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent." Ky. Rev. Stat. Ann. § 371.010(7) (West 2017). "[W]hen it was contemplated by the parties that the contract would not, and could not, be performed within the year, even though it was *possible* of performance within that time, it comes within the inhibition of the Statute." (Emphasis added.) *Williamson v. Stafford*, 190 S.W.2d 859, 860 (Ky. 1945).

¶ 34    In the present case, Hilliard Lyons argues that the statute of frauds does not apply because either party could terminate the agreement at any time. We believe, however, that the *Dixon* court's reasoning directly applies to the agreement at issue in this case. Here, the account application that the plaintiff signed expressly stated that the agreement's "time horizon" was 5 to 10 years. The application stated that the plaintiff's primary objective in investing with the defendants was "Growth and Income," which the defendants themselves defined as balancing the plaintiff's investments' "*long-term* growth and income." (Emphasis added.) We agree with the plaintiff that the parties "clearly contemplated a term of account management that extended beyond one year." Therefore, Kentucky's statute of frauds applies to the parties' agreement in this case; it must be in writing and signed by the plaintiff in order for its provisions to be enforceable against her.

¶ 35    Having determined that Kentucky's statute of frauds applies to the parties' agreement, we note that the only document signed by the plaintiff is the account application, which does not include

the arbitration provisions at issue. Like the court in *Dixon*, however, we will analyze the account application to determine whether the arbitration clauses are incorporated into the signed document by reference. The language contained in the account application must clearly show that the plaintiff had knowledge of and assented to the arbitration clauses. In addition, pursuant to KRS 446.060, the incorporation by reference language must be above the plaintiff's signature.

¶ 36    The plaintiff's signature is on the account application below the following acknowledgment: "By signing this application, I acknowledge that I understand and have received a copy of the Account Terms of Service, which, in Sections 13 and 14, require arbitration to resolve disputes." The plaintiff argues that this acknowledgment is substantially similar to the acknowledgment in *Dixon* and that the acknowledgment does not function as an affirmation of *assent* to the Account Terms of Service. We disagree.

¶ 37    The language of the acknowledgement in *Dixon* was merely that the students had read both pages of the enrollment agreement. In the present case, the acknowledgement states that the plaintiff received the Account Terms of Service and that she also *understood* the document. In *Dixon*, nothing in the decision reveals the specific language that was used on the reverse side of the enrollment agreement except a general reference to the existence of an arbitration clause on the reverse side of the document. In the present case, however, the record before us includes the specific language of the Account Terms of Service that the plaintiff "understood" prior to signing. Therefore, it is necessary to turn to the language of the Account Terms of Service to determine what exactly the plaintiff acknowledged that she "understood" prior to signing the account application. This is necessary because, under Kentucky law, a contract must be interpreted as a whole with no one part read in isolation. *Cantrell Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 384-85 (Ky. Ct. App. 2002).

¶ 38    Turning to the language of the Account Terms of Service, we note that paragraph 14 states, "You *agree* to arbitrate all controversies that may arise between us \*\*\*." (Emphasis added.) By signing the account application, therefore, the plaintiff acknowledged that she understood that she was agreeing to arbitrate. This language is vastly different from the meager acknowledgement that the students initialed in *Dixon*, which merely indicated that they read both sides of the contract.

¶ 39    Looking further at the language of the Account Terms of Service, we note that at the very beginning of the document, it specifically states that Hilliard Lyons agreed to open and maintain "one or more investment accounts." Importantly, it plainly states, "In exchange, you *agree* to the following terms of service." (Emphasis added.) Accordingly, by signing the account application, the plaintiff acknowledged that she understood that she was agreeing to the Account Terms of Service in exchange for Hilliard Lyons opening and managing the IRA account on her behalf. She acknowledged her understanding that this was a benefit of the bargain. The plaintiff, therefore, acknowledged much more than the students in *Dixon* when she placed her signature on the account application. When the documents are read together, the plaintiff acknowledged her assent to the arbitration clauses contained within the Account Terms of Service; she acknowledged that she understood this prior to signing the account application.

¶ 40    This conclusion is further bolstered by the language in the acknowledgment above the plaintiff's signature that specifically referenced the arbitration clauses by their specific paragraph numbers with the added statement that they "require arbitration to resolve disputes." See *Dakota Foundry, Inc. v. Tromley Industrial Holdings, Inc.*, 891 F. Supp. 2d 1088, 1100 (D.S.D. 2012) (stating that "a common thread through cases recognizing the ability to incorporate by reference certain provisions is language that directs the offeree to the source of that provision"). The plaintiff's signature was an acknowledgment that she "understood" that she was agreeing specifically to

14

paragraphs 13 and 14 of the Account Terms of Service that "require[d] arbitration to resolve disputes."

¶ 41    In reaching our conclusion, we are persuaded by the court's analysis in *Janiga v. Questar Capital Corp.*, 615 F.3d 735 (7th Cir. 2010), where the court analyzed similar contract language and concluded that the parties' agreement included the arbitration clause. *Janiga* involved a contract that was signed in Illinois, that provided that its enforcement shall be governed by New York's laws, and that separately provided that its arbitration agreement would be subject to Minnesota law. *Id*. at 742. In analyzing whether the parties had an agreement to arbitrate, however, the court determined that it did not have to decide which state's law applied. *Id.* The court stated, "We need not dwell on that problem *** because we see no difference among the laws of those three states that would be dispositive." *Id*. "The goal in all three states is to give effect to the intent of the parties as demonstrated through objective conduct." *Id*.

¶ 42    Likewise, in the present case, we find *Janiga* to be persuasive in applying Kentucky law to the agreement at issue because we do not believe there is a difference in Kentucky law from the three states mentioned in *Janiga* with respect to the application of the incorporation by reference doctrine. In fact, in *Dixon*, in discussing the incorporation by reference doctrine, the Kentucky Supreme Court cited 11 Williston on Contracts § 30.25 (4th ed. 2014) and parenthetically noted the treatises' compilation of "cases from various jurisdictions." *Dixon*, 483 S.W.3d at 344 n.38.

¶ 43    In *Janiga*, the defendant opened an investment account by signing a three-page "New Account Form." *Janiga*, 615 F.3d at 738. Attached to the new account form were two additional documents associated with opening the new account: (1) a client agreement and (2) a sponsorship program disclosure. Directly above the plaintiff's signature on the three-page application was the following acknowledgment: " 'I/We have read and *understood* the pre-dispute arbitration agreement

15

contained on page 4, paragraph 9 of the client agreement and have received a copy thereof.' " (Emphasis added.) *Id.* The court noted that, "[a]s that language indicate[d], the arbitration clause appear[ed] in a separate Client Agreement" that followed the page that the plaintiff signed. *Id.*

¶ 44    In finding that the parties had an agreement to arbitrate, the court specifically noted that the plaintiff signed a contract and "that the paper he signed refer[red] to arbitration," which objectively demonstrated his "assent" to the contract. *Id.* at 743. Similar to our reasoning above, the *Janiga* court analyzed the parties' agreement as follows:

"[The plaintiff] admits that he agreed to open a brokerage account. All that is left for us is to determine whether the contract he signed included an arbitration clause. It does. Even if we limit our review to the one page that [the plaintiff] signed, it is impossible to avoid the conclusion that he agreed to arbitration. As we noted at the outset of this opinion, directly above his signature is the following statement, in all capital letters: 'I/WE HAVE READ AND UNDERSTOOD THE PRE-DISPUTE ARBITRATION AGREEMENT CONTAINED ON PAGE 4, PARAGRAPH 9 OF THE CLIENT AGREEMENT AND HAVE RECEIVED A COPY THEREOF.' This clause is unambiguous; [the plaintiff] acknowledged by his signature that he read, understood, and received a copy of the arbitration agreement, and this clause (distinct from the arbitration clause itself) says that disputes would be subject to arbitration." *Id.*

¶ 45    *Janiga* is similar to *Dixon* in that the document signed by the plaintiff did not specifically use the term "assent" or "agree." However, *Janiga* is also different than *Dixon*, but similar to the present case, in that the signor acknowledged that he "understood" the terms of the arbitration provisions contained in the separate document. As is the case here, the signature in *Janiga* appeared below the acknowledgment that the person signing had read and understood the specific arbitration clause

16

contained in a separate, unsigned document entitled "Client Agreement." The court found that this acknowledgment was sufficient to establish an agreement to arbitrate; the plaintiff's signature objectively demonstrated his "assent" to arbitrate. *Id.*

¶ 46    Here, the facts are similar to those in *Janiga*, not to those in *Dixon*. The plaintiff does not dispute that she signed the account application and that above her signature she acknowledged receiving a copy of and, most importantly, *understanding* the Account Terms of Service, including the expressly referenced arbitration provisions contained in that document. Accordingly, reading the documents as a whole, the plaintiff acknowledged that, prior to signing the account application, she understood that the defendants were agreeing to open and manage her IRA account in exchange for her agreement to, among other things, arbitrate disputes stemming from the management of the account. Although nothing in the record indicates that the Account Terms of Service was physically attached to the account application, as was the case in *Janiga*, this fact does not change our analysis because physical attachment is not required in order for a separate document to be incorporated by reference. See *Dakota Foundry, Inc.*, 891 F. Supp. 2d at 1099.

¶ 47    Although the account application in the present case did not use the terms "assent" or "agree," we are persuaded by *Janiga* and other jurisdictions that have held that there are no "magic terms" that are required to incorporate another document by reference. See, *e.g.*, *Management Computer Controls, Inc. v. Charles Perry Construction, Inc.*, 743 So. 2d 627, 631 (Fla. Dist. Ct. App. 1999) (no particular "magic words" are required to incorporate a document by reference); *Northrop Grumman Information Technology, Inc. v. United States*, 535 F.3d 1339, 1346 (Fed. Cir. 2008) (same). What is important to our analysis is that the plaintiff acknowledged that she understood the Account Terms of Service, which, in turn, expressly stated that arbitration was part of

17

the consideration for the agreement, and she understood that she was agreeing to arbitrate disputes before she signed the contract.

¶ 48     When the acknowledgement above the plaintiff's signature is read in conjunction with the language of the Account Terms of Service, it is clear that the documents as a whole reveal the intent of the parties to be bound to the arbitration provisions contained in paragraphs 13 and 14 in the Account Terms of Service. As a result, the circuit court erred in holding that the parties' agreement did not incorporate the arbitration clauses by reference. See also *Lenz v. FSC Securities Corp.*, 2018 MT 67, ¶ 20, 414 P.3d 1262 ("[T]he signature page forms conspicuously, clearly, and unambiguously referenced a separate customer agreement form and conspicuously gave notice that the customer agreement form contained an arbitration agreement. *** The signature page form also clearly, conspicuously, and unambiguously stated and notified the signatory that, by signing, the client acknowledged receipt of a copy of the customer agreement form.").

¶ 49                                    E. Statute of Frauds

¶ 50     In the proceedings below, the circuit court held that the Account Terms of Service could not be enforced as a stand-alone agreement under Kentucky's statute of frauds because it was not signed by the plaintiff. However, for the reasons stated above, we hold that the account application, which was signed by the plaintiff, sufficiently incorporated the Account Terms of Service into the parties' agreement by reference. Therefore, the circuit court's conclusion that the Account Terms of Service must be separately signed by the plaintiff under Kentucky's statute of frauds is incorrect.

¶ 51     Where the signature of the party to be charged is made or adopted with reference to an unsigned writing, the signed and unsigned writings together may constitute a memorandum. Restatement (Second) of Contracts § 132 cmt. c (1981); see also 11 Williston on Contracts § 30.25 (4th ed. 1999) ("When a writing refers to another document, that other document, or the portion to

18

which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument. The incorporated matter is to be interpreted as part of the writing.").

¶ 52     Accordingly, in the present case, the Account Terms of Service is not a stand-alone agreement but is part of the entire written agreement signed by the plaintiff. Enforcing the arbitration provision in the Account Terms of Service does not violate Kentucky's statute of frauds.

¶ 53                         F. Whether the Federal Arbitration Act or
            Kentucky's Uniform Arbitration Act Applies to the Proceedings on Remand

¶ 54     In the proceedings below, the parties disagreed concerning the application of the Federal Arbitration Act to the controversy. The defendants argued that the contract at issue involved interstate commerce and is therefore subject to the Federal Arbitration Act (9 U.S.C. § 1 *et seq.* (2012)). See *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 252 (1987). The plaintiff, however, argued that the arbitration provision was governed solely by Kentucky's Uniform Arbitration Act (Ky. Rev. Stat. Ann. § 417.045 *et seq.* (West 2017)), as opposed to the Federal Arbitration Act.

¶ 55     As we have explained, the circuit court held that, under Kentucky law, the parties did not have an agreement to arbitrate their dispute. The circuit court, therefore, concluded that it did not need to decide the issue of whether the Federal Arbitration Act preempted the Kentucky Uniform Arbitration Act. On appeal, the defendants request that we address this issue and determine whether the Federal Arbitration Act or the Kentucky Uniform Arbitration Act applies to the proceedings on remand.

¶ 56     However, we agree with the plaintiff that our review of the circuit court's decision in this case should be limited to the issues the circuit court addressed and decided. See, *e.g.*, *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 33 ("Because the circuit court did not rule on the alternative grounds raised in defendants' motions to dismiss, we think it is appropriate to remand this case so

19

that the circuit court can consider and rule on each of those issues in the first instance."). Our task in this interlocutory appeal is to determine whether the parties have a valid and enforceable agreement to arbitrate under Kentucky's contract formation principles. We have done so and now remand for further proceedings. We will not usurp the circuit court's function on remand by addressing matters on appeal that should be addressed by the circuit court in the first instance.

¶ 57    The plaintiff filed a motion requesting that we strike that portion of the defendants' brief that raised this issue. Because we decline to consider the merits of the argument on appeal, we deny the plaintiff's motion to strike that portion of the defendants' brief as being moot.

¶ 58            G. Plaintiff's Motion to Strike Portions of the Defendants' Brief That
                         Raise New Arguments on Appeal

¶ 59    In their brief, in addition to the incorporation by reference doctrine, the defendants also argue that the plaintiff manifested her assent to the Account Terms of Service by opening the IRA account after reading the document. Citing *Energy Home, Division of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 837 (Ky. 2013), the defendants argue that, under Kentucky law, arbitration agreements are not required to be signed to be enforceable, so long as the parties have indicated their acceptance of the contract through their actions.

¶ 60    The plaintiff moved to strike this portion of the defendants' brief, arguing that the defendants' position in the proceedings below was that the account application incorporated the Account Terms of Service by reference. The plaintiff argues in her motion to strike that the defendants' argument based on *Energy Home* is a new theory that cannot be raised for the first time on appeal. The plaintiff also requested leave to respond to the merits of the argument should we deny her motion to strike.

¶ 61    As noted above, however, we hold that the account application that the plaintiff signed incorporated the Account Terms of Service by reference such that the documents are to be construed

20

as one contract. We need not address the defendants' alternative argument that the plaintiff indicated her acceptance of the Account Terms of Service by her actions. Accordingly, we deny the plaintiff's motion to strike that portion of the defendants' brief as moot.

¶ 62                                    III. CONCLUSION

¶ 63    For the foregoing reasons, we deny the plaintiff's motion to strike portions of the defendants' brief; we reverse the circuit court's order denying the defendants' motion to dismiss or stay; and we remand this case for further proceedings consistent with this decision.

¶ 64    Reversed and remanded; motion denied.

2018 IL App (5th) 180214

NO. 5-18-0214

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

<table>
<tr><td>JUNE M. WARD,</td><td>)</td><td>Appeal from the</td></tr>
<tr><td></td><td>)</td><td>Circuit Court of</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td><td>Randolph County.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>No. 16-L-27</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>J.J.B. HILLIARD; W.L. LYONS, LLC, d/b/a</td><td>)</td><td></td></tr>
<tr><td>Hilliard Lyons, a Kentucky Corporation; and</td><td>)</td><td></td></tr>
<tr><td>MICHAEL BARNETT,</td><td>)</td><td>Honorable</td></tr>
<tr><td></td><td>)</td><td>Thomas B. Cannady,</td></tr>
<tr><td>Defendants-Appellants.</td><td>)</td><td>Judge, presiding.</td></tr>
</table>

**Rule 23 Order Filed:**     September 6, 2018
**Motion to Publish Granted:**     October 5, 2018
**Opinion Filed:**     October 5, 2018

**Justices:**     Honorable David K. Overstreet, J.

Honorable Thomas M. Welch, J., and
Honorable James R. Moore, J.,
Concur

**Attorneys for Appellants**     Glenn E. Davis, Hepler Broom, LLC, 211 North Broadway, Suite 2700, St. Louis, MO 63102; Janet P. Jakubowicz, Rachel A. Washburn, Bingham Greenbaum Doll, LLP, 101 South Fifth Street, Suite 3500, Louisville, KY 40202

**Attorney for Appellee**     Nathaniel O. Brown, Weilmuenster & Keck, P.C., 3201 West Main Street, Belleville, IL 62226