RENDERED:  MARCH 4, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0020-MR

UNIVERSITY OF KENTUCKY                              APPELLANT

v.                  APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 20-CI-00648

PETER REGARD, LEAH OUSLEY,
HALEIGH ALEXANDRA LONG,
MERIDETH MULLIN, ANNA QUINN
CURRAN, MACKENZIE PUTTEET,
AND KEEGAN MCLARNEY                      APPELLEES

OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND JONES, JUDGES.

JONES, JUDGE:  The Appellant, the University of Kentucky ("the University"),

seeks review of the Franklin Circuit Court's December 30, 2020 order granting in

part and denying in part the University's motion to dismiss on the basis of

governmental immunity.[1]  Relevant to this appeal, the circuit court determined that

Appellees' breach of contract claim seeking a refund of tuition and fees from the

University is not barred by governmental immunity:  (1) because it falls within

KRS[2] 45A.245's waiver provision; and (2) because Appellees are seeking a refund

of their own money and not damages from the state treasury.  The University

contends that the circuit court erred with respect to both conclusions.  Having

reviewed the record, and being otherwise sufficiently advised in the law, we agree

with the University that the circuit court erred to the extent it determined that the

University's governmental immunity was not implicated based on the source of the

funds; however, we disagree that the circuit court erred when it determined that

Appellees' breach of contract claim falls within KRS 45A.245's waiver of

immunity.  As such, we affirm in part, reverse in part, and remand for further

proceedings.

## I. BACKGROUND

Appellees were enrolled at the University as full-time, on-campus

students for the University's 2020 Spring Semester ("Spring Semester") which

began in mid-January 2020 and ended in May 2020.  (Record ("R.") at 56.)  Like

---

[1]  The circuit court's order described the University's immunity as "sovereign," while the parties have used  "governmental" and "sovereign" interchangeably.  In keeping with the language used most recently by the Kentucky Supreme Court, we refer to the University's immunity as being "governmental" as opposed to "sovereign."

[2]  Kentucky Revised Statutes.

all full-time, on-campus students, in addition to tuition, Appellees were charged

mandatory fees by the University for the Spring Semester.  (R. at 58.)  The fees

were allocated for various purposes, including student health, the student center,

and the Johnson Center.  (R. at 137.)

Just as the Spring Semester was getting underway at the University,

health officials began to focus on a new respiratory disease spreading and causing

illness in certain parts of China, coronavirus disease 2019 ("COVID-19"), an

illness caused by the SARS-CoV-2 virus.[3]  After COVID-19 was detected in other

parts of the world, local and national governments across the globe began to take

actions to curb the spread of the virus.  These actions varied in length and severity

depending on the locale.  Some were voluntary while others were mandated.  By

the late winter and into the early spring of 2020, national health officials were

advising the public to maintain social distancing and to stay home whenever

possible to avoid spreading COVID-19.[4]

It is against this backdrop that the University decided to implement

certain emergency measures to protect its students, faculty, and staff from COVID-

---

[3]  Centers for Disease Control and Prevention, *Basics of COVID-19*,
https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html
(last updated May 24, 2021).

[4]  The World Health Organization declared COVID-19 "a public health emergency of
international concern" on January 30, 2020, and a global pandemic on March 11, 2020.
https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline (last
accessed Nov. 29, 2021).

19. Effective March 23, 2020, the University ceased all in-person, on-campus instruction for the remainder of the Spring Semester. After this date, all classes were conducted remotely. Additionally, according to Appellees, "the campus was effectively shut down for student use and access." (R. at 58.) The University did not issue any refunds to its students to compensate them for the change in class format or their reduced access to campus-related services. (*Id.*)

On or about August 7, 2020, the seven Appellees filed this putative class action lawsuit against the University in Franklin Circuit Court seeking a refund of the fees and tuition they paid the University for the Spring Semester.[5] (R. at 3-10.) The University was served with Appellees' complaint on or about August 24, 2020. (R. at 16.) Approximately a week later, the University filed a motion to dismiss the complaint in its entirety pursuant to CR 12.02(a) and (f). (R. at 17.) As related to immunity, the University argued that summary dismissal was required because Appellees had failed to identify a written contract between themselves and the University that would permit suit under the terms of KRS 45A.245. (R. at 19-44.)

---

[5] Appellees are seeking to represent themselves and "all people who contracted with [the University] in writing for certain services and paid for those services in the form of tuition and mandatory fees, and who because of [the University's] response and policies relating to the [COVID-19] pandemic, lost the benefits of the services for which they had paid, and/or the services for which their fees were paid, without having those fees and costs refunded to them." (R. at 53-54.) The circuit court has not yet determined whether class certification is appropriate. Kentucky Rules of Civil Procedure ("CR") 23.03.

On the same day the University's motion to dismiss was scheduled to be heard, Appellees filed a first amended complaint as a matter of right pursuant to CR 15.01. (R. at 53-226.) In addition to adding a count for unjust enrichment, Appellees attempted to shore up their breach of contract claim by attaching a series of documents exchanged between themselves and the University.[6] Appellees alleged that the "documents, taken as a whole, constitute the written contract for on-campus instruction and use of facilities and other benefits related to mandatory fees" allowing them to maintain suit against the University pursuant to KRS 45A.245. (R. at 56.)

After Appellees filed their first amended complaint, the circuit court ordered the University's prior motion to dismiss withdrawn, and the University was given additional time to respond to the amended complaint. (R. at 248.) A short time later, the University filed another motion to dismiss in which it disclaimed Appellees' allegation that the documents included as part of their amended complaint constituted a written contract. (R. at 250-344.) Alternatively,

---

[6] The following exhibits were included as part of Appellees' first amended complaint: (1) the University's April 6, 2020 Senate Council Minutes, (R. at 68-73); (2) a printout of the online application portal, (R. at 74-84); (3) a printout of the electronic confirmation and certification of application materials, (R. at 85-86); (4) a printout of the online, registration orientation, (R. at 87-95); (5) a printout of the online registration portal, (R. at 96-104); (6) a printout of the online student statement of financial obligation, (R. at 105-07); (7) excerpts from the 2019-2020 University Bulletin, (R. at 108-141); (8) Administrative Regulations 8.7, (R. at 142-46); (9) the University Senate Rules, (R. at 147-58); (10) a printout from academic ombud services defining a course syllabus, requirements for University syllabi and the University's syllabus template, (R. at 159-88); and (11) selected syllabi for various Spring Semester courses, (R. at 189-226).

the University argued that even under the terms of the documents included as part of the first amended complaint, Appellees had failed to state a claim upon which relief can be granted because they could not show any actual breach of a promise made to them by the University. (*Id.*)

Following additional briefing and argument by counsel, the circuit court entered an order partially granting and partially denying the University's motion to dismiss. (R. at 448-63.) With respect to immunity, the circuit court determined that: (1) Appellees' breach of contract claim falls within the scope of KRS 45A.245's waiver of governmental immunity insomuch as the Statement of Financial Obligation, Exhibit 6 of the amended complaint, constitutes a written contract between Appellees and the University and the supplemental materials relied on by Appellees "merely reinforce the terms of that contract and the expectations of the parties," (R. at 455); (2) Appellees' breach of contract claim is not barred by governmental immunity because Appellees seek a return of money they paid to the University rather than damages from the state treasury, (R. at 458); and (3) Appellees' unjust enrichment claim is barred by governmental immunity because "unlike claims for breach of contract, there has been no limited statutory waiver of claims for unjust enrichment against agencies of the Commonwealth," (R. at 461).

After determining that Appellees' breach of contract claim was not barred by immunity, the circuit court turned to the University's argument that Appellees had failed to demonstrate that the University's decision to move classes online caused it to breach any specific, written promises made to Appellees. The circuit court determined that even though the classes were moved to an online format, Appellees still received the benefit of their bargain with the University as related to their *tuition* payments because they received instruction, grades, and academic credit. (R. at 460.) However, the court determined that Appellees had sufficiently pled a breach of contract claim as to the mandatory *fees* insomuch as Appellees alleged they were denied a full semester of access to the services and facilities for which they paid the fees. (*Id.*)

The University immediately filed this appeal pursuant to *Breathitt County Board of Education v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009), seeking review of those portions of the circuit court's order adverse to its claim of governmental immunity.[7]

---

[7] The University filed its notice of appeal on January 5, 2021. Not quite a week later, on January 11, 2021, Appellees filed a motion to reconsider wherein they requested the circuit court to reconsider that portion of its order which dismissed Appellees' claim for a refund of all or a portion of their tuition payments for the Spring Semester for failure to state a claim upon which relief can be granted pursuant to CR 12.02(f). After briefing was complete, the circuit court entered an order denying the motion without prejudice. The circuit court explained that it believed denial with leave to refile was appropriate until such time as the appellate courts had rendered a final determination on the University's interlocutory appeal on the immunity issue.

-7-

## II. SCOPE OF REVIEW

"[A]n order denying a substantial claim of absolute immunity is immediately appealable even in the absence of a final judgment." *Prater*, 292 S.W.3d at 887. Accordingly, we have jurisdiction to review the issue of immunity despite the interlocutory nature of the circuit court's order. *Id.*

As part of the order under review, the circuit court also addressed substantive aspects of Appellees' claims, *i.e.*, whether Appellees stated a viable breach of contract claim upon which relief can be granted. Even though the circuit court addressed the CR 12.02(f) issue in the same order as the immunity issue, the scope of our appellate review must be confined to the circuit court's determination on the issue of governmental immunity "and nothing more." *Commonwealth Cabinet for Health and Family Services, Department for Medicaid Services v. Sexton by and through Appalachian Regional Healthcare, Inc.*, 566 S.W.3d 185, 190 (Ky. 2018) (quoting *Baker v. Fields*, 543 S.W.3d 575, 578 (Ky. 2018)). As such, nothing herein should be construed as this Court expressing an opinion on the propriety of the circuit court's rulings under CR 12.02(f).

## III. STANDARD OF REVIEW

The issue of whether a defendant is entitled to the defense of sovereign or governmental immunity is a question of law. *See Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citing *Jefferson County Fiscal Court v.*

*Peerce*, 132 S.W.3d 824, 833 (Ky. 2004)).  Likewise, the issue of contract formation is a question of law.  *Baumann Paper Co., Inc. v. Holland*, 554 S.W.3d 845, 848 (Ky. 2018).  Questions of law are reviewed *de novo*.  *Jacobi v. Holbert*, 553 S.W.3d 246, 252 (Ky. 2018).  This means "we owe no deference to the legal conclusions of the court[] below."  *Howard v. Big Sandy Area Development District, Inc.*, 626 S.W.3d 466, 470 (Ky. 2020).

## IV.  ANALYSIS

"Sovereign immunity is a bedrock component of the American governmental ideal, and is a holdover from the earliest days of the Commonwealth, having been brought over from the English common law."  *Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 799 (Ky. 2009).  Conceptionally, sovereign immunity is best viewed as an intrinsic attribute of the state itself.  *Commonwealth v. Kelley*, 314 Ky. 581, 583, 236 S.W.2d 695, 696 (1951) ("Immunity from suit has always been an attribute of state sovereignty.");  *Yanero v. Davis*, 65 S.W.3d 510, 517 (Ky. 2001).  The state's inherent immunity is broad; it protects the state not only from the imposition of money damages but also from the burdens of defending a lawsuit.  *Meinhart v. Louisville Metro Government*, 627 S.W.3d 824, 830 (Ky. 2021); *Lexington-Fayette Urban County Government v. Smolcic*, 142 S.W.3d 128, 135 (Ky. 2004) ("Immunity from suit includes protection against the 'cost[s] of trial' and the 'burdens of broad-reaching

-9-

discovery' that 'are peculiarly disruptive of effective government.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 409-10 (1982)).

Because much of the state's work is actually performed at the agency level, the doctrine of sovereign immunity has evolved over time. *Jacobi*, 553 S.W.3d at 254. It is now well established that departments, boards, and agencies that are integral parts of state government enjoy the same type of immunity as the state itself. *See Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839, 846 (Ky. 2019). However, the immunity of governmental and quasi-governmental agencies is referred to as "governmental" as opposed to "sovereign" immunity. *Id.*

The central difference between governmental and sovereign immunity is that the state, as a separate, sovereign entity, enjoys automatic, unqualified immunity. The state's immunity flows from its very existence as a sovereign. Governmental immunity, however, is not automatic. The immunity of "public and quasi-public agencies outside the fundamental departments of state government" depends on whether the agency was created by or at the behest of the state and whether it is performing a function that is integral to state government. *Board of Trustees of Kentucky School Boards Insurance Tr. v. Pope*, 528 S.W.3d 901, 904 (Ky. 2017) (citing *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91 (Ky. 2009)).

Over the years, Kentucky appellate opinions have inconsistently described the University's immunity, sometimes calling it sovereign and other times referring to it as governmental. The University is "an independent agency and instrumentality of the Commonwealth[,]" which is attached to the executive branch. *University of Kentucky v. Moore*, 599 S.W.3d 798, 809 (Ky. 2019) (quoting KRS 164.225). As such, it is more properly described as enjoying governmental as opposed to sovereign immunity. *See id*. However, the discrepancy in terminology is a distinction without a difference because, irrespective of the precise descriptive label, it is beyond dispute that the University is entitled to immunity from suit except as authorized by the General Assembly. *Furtula v. University of Kentucky*, 438 S.W.3d 303, 305 (Ky. 2014) ("The state universities of this Commonwealth, including the University of Kentucky, are state agencies that enjoy the benefits and protection of governmental immunity except where it has been explicitly waived by the legislature."); *Withers v. University of Kentucky*, 939 S.W.2d 340, 343 (Ky. 1997) ("[The] University of Kentucky is entitled to sovereign immunity"); *Department of Corrections v. Furr*, 23 S.W.3d 615, 617 (Ky. 2000) (internal quotation marks and citations omitted) ("The doctrine of sovereign immunity sweeps broadly. It shields *inter alia* counties, boards of education, public universities, university hospitals and all departments,

-11-

boards or agencies that are such integral parts of state government as to come within regular patterns of administrative organization and structure.").

Our conclusion that the University is entitled to claim governmental immunity, however, is just the beginning of our inquiry. This is because the Constitution of Kentucky vests the General Assembly with the authority to waive immunity for the Commonwealth and its agencies. *Benningfield v. Fields*, 584 S.W.3d 731, 736 (Ky. 2019). Specifically, Section 231 provides: "The General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." KY. CONST. § 231. We will only find a Section 231 waiver where the General Assembly has made it unambiguously clear by use of "the most express language[,] or by such overwhelming implication[s] from the text as [will] leave no room for any other reasonable construction." *Withers*, 939 S.W.2d at 346 (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S. Ct. 458, 464, 53 L. Ed. 742 (1909)). In the absence of a statute authorizing suit, we presume that the General Assembly has not waived the state's immunity. *Reyes v. Hardin County*, 55 S.W.3d 337, 342 (Ky. 2001) (citations omitted) ("There is no need for a statute that *precludes* a suit against an immune entity, for such is inherent in the doctrine of sovereign immunity. A statute is required only if the legislature intends to *permit* such a suit.").

-12-

With these principles in mind, we now turn to specific immunity questions presented by this appeal: (1) whether the circuit court erred as a matter of law in concluding that immunity did not bar Appellees from suing the University because they were merely seeking a return of their money and not money damages from the state treasury; and (2) whether the circuit court erred as a matter of law in concluding that Appellees' breach of contract claims fall within KRS 45A.245's waiver provision for suits based on written contracts.

## A. *Source of Funds*

Appellees included an alternative count of unjust enrichment against the University as part of their first amended complaint. This count's language makes clear that Appellees were trying to plead their way over the immunity hurdle in the event they were determined not to have written contracts with the University. Within the allegations of their unjust enrichment count, Appellees alleged that the University should not be protected by governmental immunity because Appellees were not seeking "money from the general fund of the Commonwealth of Kentucky but rather the return of their tuition and fee payments paid to the University." (R. at 64.) Appellees posited that the University should be deemed to be holding their tuition and fees in a constructive trust and ordered to return it to them.

"[A] constructive trust arises when a person entitled to property is under the equitable duty to convey it to another because he would be unjustly enriched if he were permitted to retain it." *Patel v. Tuttle Properties, LLC*, 392 S.W.3d 384, 387-88 (Ky. 2013) (quoting *Terrill v. Estate of Terrill*, 217 S.W.3d 858, 860 (Ky. App. 2006)). "[I]nvoking the trust is not enforcing a contract but is providing equitable relief from a fraud or breach of confidence." *O'Bryan v. Bickett*, 419 S.W.2d 726, 728 (Ky. 1967).

Confusingly, the circuit court concluded that Appellees' claim for unjust enrichment must be dismissed because "there has been no limited statutory waiver of claims for unjust enrichment against agencies of the Commonwealth," (R. at 442), yet also determined that the remedy sought by Appellees for unjust enrichment, a return of their money under a constructive trust theory, is not barred by sovereign immunity. We are unsure how the circuit court intended these two conclusions to be reconciled with one another. However, we need not concern ourselves too much about this seeming inconsistency because while the circuit court was correct on its first conclusion, it erred as a matter of law on the second.

The circuit court concluded that the University's immunity was not infringed where Appellees "are seeking a return of their money rather than payment from the State Treasury." (R. at 440.) It pointed out that the money originated with the students and was not allocated to the University by the General

-14-

Assembly. Since the money was not generated "pursuant to the taxing power of the state," the circuit court concluded that the refund requested by Appellees implicated neither the state treasury nor the doctrine of governmental immunity.[8] (R. at 440-41.)

The circuit court's order asserted, "[i]n [*Beshear v. Haydon Bridge Company, Inc.*, 416 S.W.3d 280 (Ky. 2013)], the Supreme Court of Kentucky noted that sovereign immunity in Kentucky is rooted in Sections 230 and 231 of the Kentucky Constitution." (R. at 439.) The relevant portion of Section 230 states that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law[,]" while Section 231 states, "[t]he General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." Because Appellees sought relief in the form of refunded tuition and fees from the University, rather than a direct withdrawal of funds from the state treasury, the circuit court found governmental immunity was not implicated.

The circuit court's source-of-funds reasoning relies on a misreading of *Haydon Bridge* in order to conclude immunity will not lie under a negative

---

[8] The circuit court observed in a footnote that the University's refusal to issue the refunds might also be classified as "a constitutional taking of property without just compensation" for which suit would be authorized. (R. at 441.) Because the circuit court only mentioned this alternative theory in passing and the parties have made no mention of it, we will not address it. Suffice it to say, Appellees' pleadings give no indication that they are pursuing a constitutional takings claim against the University.

implication of Section 230; *i.e.*, that suits against the Commonwealth which do not touch the state treasury do not trigger sovereign or governmental immunity. However, sovereign immunity is not exclusively constrained or defined by Section 230. Sovereign immunity is "an inherent attribute of the state." *Yanero*, 65 S.W.3d at 523. It does not depend on Sections 230 and 231 of the Kentucky Constitution, and *Haydon Bridge* itself explicitly rejects such a reading:

> Although some cases suggest that Sections 230 and 231 are the source of sovereign immunity in Kentucky, *e.g.*, *Bach v. Bach*, Ky., 288 S.W.2d 52, 54 (1956), those sections are more accurately viewed as delegating to the General Assembly the authority to waive the Commonwealth's inherent immunity by direct appropriation of money from the state treasury and/or by specifying where and in what manner the Commonwealth may be sued.

*Haydon Bridge*, 416 S.W.3d at 287;[9] *see also Reyes*, 55 S.W.3d at 339.

Additionally, in one of its later opinions considering the financing of public university budgets, the Kentucky Supreme Court held universities, "unlike other government entities, are given their own money to be held in their own accounts," while simultaneously pointing out that these same universities "retain[]

---

[9] *Haydon Bridge*'s discussion occurred in the context of the declaratory and injunctive relief exceptions to sovereign immunity. 416 S.W.3d at 293-94. In other words, it had already been established that the plaintiffs in *Haydon Bridge* had a right to file suit against the Commonwealth to challenge the constitutionality of a statute. *Id.* at 289 ("[P]rospective injunctive powers are available to Kentucky courts in cases such as this and those powers include both temporary relief pending a declaration of unconstitutionality under the Kentucky Constitution as well as permanent relief in a final judgment."). Appellees have not sought either injunctive or declaratory relief against the University.

many of the government's characteristics, such as immunity from suit." *Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 380-81 (Ky. 2016). The circuit court's source-of-funds immunity analysis does not comport with the Supreme Court's reasoning.

At the time Appellees paid their tuition and fees, the funds became the University's property. The University is "a state agency because it serves as a central arm of the state performing the essential function of educating state citizens at the college level and because it receives money from the state treasury in support of this function." *Autry v. Western Kentucky University*, 219 S.W.3d 713, 717 (Ky. 2007). The fact that the University also receives money from other private sources, like Appellees, does not diminish its status as a state agency or its immunity from suit. *Comair, Inc.*, 295 S.W.3d at 102 ("The fact that the Board has substantial revenue from fees charged while operating the airport also does not make the activity proprietary.").

"Once it has been determined that an entity is entitled to sovereign [or governmental] immunity, this Court has no right to merely refuse to apply it or abrogate the legal doctrine." *Withers*, 939 S.W.2d at 344. Applicable here, the University's immunity dictates that *suit* cannot be maintained against it except as authorized by the General Assembly. There is no exception for suits in equity, fraud, or bad faith or where the plaintiff is merely seeking a refund of money

generated outside of the Commonwealth's taxing power. If sovereign or governmental immunity depended on whether the source of funds sought derived from the state treasury, any government agency purchasing an insurance policy would lose its immunity protection, and we know this is not correct. "[A] waiver of sovereign immunity shall not be construed from the purchase of liability insurance or the establishment of a fund for self-insurance." *Id.* at 345.

To be clear, the General Assembly has not authorized suits against the state or its agencies for unjust enrichment. *Lipson v. University of Louisville*, 556 S.W.3d 18, 28 (Ky. App. 2018) ("Whatever the merits of Lipson's unjust enrichment claim against the University may be, Lipson cannot recover against the University under this equitable remedy because there is no waiver of immunity for anything other than a written contract."). By the same token, the General Assembly has not excepted claims against the Commonwealth and its agencies based on the source of the funds at issue.[10] Accordingly, we reverse the circuit

---

[10] In fact, the General Assembly has directed how money judgments for breach of contract claims against state agencies are to be paid without regard to the source of the original funds.

> (1) Each agency which has had an award or judgment against it upon a claim filed pursuant to KRS 45A.240 to 45A.270 shall furnish a certified copy of the award of judgment to the Finance and Administration Cabinet. The first five hundred thousand dollars ($500,000) of any award or judgment against the Department of Highways, Transportation Cabinet, shall be paid out of the state road fund, upon warrants drawn by the secretary of the Finance and Administration Cabinet upon the State Treasurer. The first five hundred thousand dollars ($500,000) of any award or judgment against other departments or agencies of the state, which

court's order to the extent it determined that Appellees' claims were not barred by governmental immunity "based on the nature of the damages that they seek." (R. at 458.)

## B. Breach of Contract

While the defense of sovereign or governmental immunity usually arises from tort claims, "[t]he doctrine extends to both actions in tort and contract." *University of Louisville v. Martin*, 574 S.W.2d 676, 677 (Ky. App. 1978). In this case, the circuit court concluded Appellees' breach of contract claim against the University "falls squarely within the waiver of sovereign immunity set forth in KRS 45A.245." (R. at 432.)

KRS 45A.245, codified within Kentucky's Model Procurement Code ("KMPC"), provides:

> (1) Any person, firm or corporation, having ***a lawfully authorized written contract*** with the Commonwealth at the time of or after June 21, 1974, ***may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts***

---

are not maintained by appropriations out of the general fund, shall be paid out of the funds created or collected for the maintenance and operation of such department or agency, upon warrants drawn by the secretary of the Finance and Administration Cabinet upon the State Treasurer. The first five hundred thousand dollars ($500,000) of any award or judgment against all other departments and agencies of the state shall be paid out of the general fund, upon warrants drawn by the secretary of the Finance and Administration Cabinet upon the State Treasurer.

KRS 45A.270(1).

***or for enforcement of contracts or for both***.  Any such action shall be brought in the Franklin Circuit Court and shall be tried by the court sitting without a jury.  All defenses in law or equity, except the defense of governmental immunity, shall be preserved to the Commonwealth.

(2) If damages awarded on any contract claim under this section exceed the original amount of the contract, such excess shall be limited to an amount which is equal to the amount of the original contract.

(Emphasis added.)  Although KRS 45A.245 is contained within the KMPC, its "immunity is *not* limited to contracts entered into pursuant to the KMPC[.]" *University of Louisville v. Rothstein*, 532 S.W.3d 644, 647 (Ky. 2017).  "KRS 45A.245 is an unqualified waiver of immunity in all cases based on a written contract with the Commonwealth[.]"  *Id.*

The University asserts that Appellees cannot rely on KRS 45A.245 because they do not have written contracts with it.  Appellees allege that a number of documents, which they included as exhibits to their first amended complaint, "taken as a whole" comprise their written contract with the University.  (R. at 56.) The University concedes these documents were either given to Appellees or at least referenced at some point during Appellees' tenure with it.  However, it vigorously denies ever having entered into any written contracts with Appellees.

-20-

According to the University, at best, a portion of these documents may have created an implied contract,[11] which is insufficient under KRS 45A.245.

"The cases generally hold that a written instrument which sets forth the undertaking of the persons executing it or discloses terms from which such an undertaking can be imported, and which shows the consideration for the undertaking, and which identifies the parties thereto, will be considered a contract in writing." *Mills v. McGaffee*, 254 S.W.2d 716, 717 (Ky. 1953). "[W]here an instrument containing all the terms of a completed contract between two parties is executed by one of the parties and accepted or adopted by the other, the instrument constitutes a contract in writing." *Gray v. International Ass'n of Heat & Frost Insulators and Asbestos Workers, Local No. 51*, 447 F.2d 1118, 1121 (6th Cir. 1971) (citation omitted).

However, all the terms do not have to be contained within a single document. *Dixon v. Daymar Colleges Group, LLC*, 483 S.W.3d 332, 344 (Ky. 2015); *Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970). "Terms and conditions incorporated by reference are enforceable." *Home Lumber Co. v. Appalachian Regional Hosps., Inc.*, 722 S.W.2d 912, 914 (Ky. App. 1987).

---

[11] "To establish a contract implied in fact, the evidence must disclose an actual agreement or meeting of the minds although not expressed and such is implied or presumed from the acts or circumstances which according to the ordinary course of dealing and the common understanding of men shows a mutual intent to contract." *Rider v. Combs*, 256 S.W.2d 749, 749 (Ky. 1953).

"For a contract validly to incorporate other terms, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.' In addition, there must be 'clear language [ ] express[ing] the incorporation of other terms and conditions[.]'" *Dixon*, 483 S.W.3d at 344 (quoting 11 WILLISTON ON CONTRACTS § 30.25 (4th ed. 2014); *Bartelt Aviation, Inc. v. Dry Lake Coal Co., Inc.*, 682 S.W.2d 796, 797 (Ky. App. 1985)).

The Kentucky Supreme Court first considered whether university informational documents and policies could create contractual obligations sufficient to satisfy KRS 45A.245's requirements in *Furtula v. University of Kentucky*, *supra*. The plaintiff in *Furtula* claimed that the University's employee handbook constituted a written employment contract. No other employment contract was alleged. Further, the handbook at issue contained a disclaimer at the beginning that specifically stated that the handbook was not a contract and that all employees at the University are considered "at will." *Furtula*, 438 S.W.3d at 309. Ultimately, the Court held that the University was entitled to immunity because the plaintiff had "not established that the General Assembly expressly waived sovereign immunity in claims based upon implied contracts arising from a state university's employee handbooks and personnel policies, and because the relevant University of Kentucky personnel documents specifically disclaimed the creation of a contract[.]" *Id.* at 310.

Most recently, the Kentucky Supreme Court considered KRS 45A.245's written contract requirement in *Britt v. University of Louisville*, 628 S.W.3d 1 (Ky. 2021). In that case, the University of Louisville sent Dr. Britt a letter in the fall of 2003 indicating that she was going to be recommended for appointment to a full-time, tenure track position. *Id.* at 3. "The letter set out the terms and conditions of the position, including the duration of the appointment and first year's salary." *Id.* "The letter further stated other terms and conditions applicable to the appointment, such as the policies governing personnel reviews and termination, were set out in the University's governance document, The *Redbook*, and other relevant college-level policy statements." *Id.* Dr. Britt was asked to communicate her acceptance by signing and returning the letter, which she did. *Id.* Similar letters were sent for several years thereafter. *Id.* However, Dr. Britt's 2009 application for tenure was denied, and her employment with the University of Louisville terminated after the 2011 spring semester. *Id.* at 4. In 2012, "Dr. Britt filed suit against the University . . . alleg[ing] . . . that the University breached its employment contract with her when it violated provisions of its policy manuals and failed to provide her with adequate time to perform the research necessary for her to obtain tenure." *Id.* The University of Louisville sought dismissal of the complaint on the basis that it was entitled to governmental immunity. *Id.* It argued that the appointment letters did not meet KRS 45A.245's

-23-

requirement for a written contract, and alternatively, even if the letters did constitute written contracts, "those contracts did not incorporate the University's personnel policies as contractual promises." *Id.*

Our Supreme Court held that while Dr. Britt did not work under a written contract with the University every year, "the parties did execute a series of valid, written contracts for at least five of those years" by virtue of the offer letters sent to Dr. Britt. *Id.* at 6. The Court then considered whether the terms of The *Redbook*, which contained the policies and procedures at issue, could be considered part of the parties' written contracts. *Id.* at 7-8. Ultimately, the Court held "the provisions of The *Redbook* and its associated personnel policies relevant to Dr. Britt's position, including but not limited to the University [of Louisville's] policies regarding tenure, personnel review, and termination, to be validly incorporated into each of the [] contracts." *Id.* at 8. It reached this holding based on language in the letters[12] in which the University had indicated that The *Redbook*

---

[12] "The letters provide[d] that '[t]he terms and conditions of employment in the University of Louisville herein specified include all rules and regulations promulgated on the authority of the University of Louisville Board of Trustees and the governance document known as The *Redbook*.'" *Id.* at 3. "Regarding tenure, each letter state[d] '[t]he appointment . . . is subject to the tenure policy of the University of Louisville. Under the policy of The *Redbook*, tenure in this position would be awarded July 1, 2011 should it be mutually agreeable to make renewals of this appointment beyond this date.'" *Id.* at 3-4.

-24-

"***shall control, decide, or affect its relationship***" with Dr. Britt.[13]  *Id.* (emphasis added).

With this framework in mind, we now turn to the documents relied on by Appellees.  We cannot agree with Appellees that each of the documents included as part of their first amended complaint is part of a written contract with the University with respect to the payment of fees and tuition for the Spring Semester.  Exhibits 2-3 of Appellees' first amended complaint are a compilation of the University's online admissions application and related materials.  The admissions process necessarily predated the payment of fees and tuition for the 2020 Spring Semester.  On the other end of the spectrum, Exhibits 10-11 of Appellees' first amended complaint relate to the creation and effect of class syllabi. While the syllabi guidelines describe each syllabus as an "academic contract" with the students, the actual syllabi were not distributed to Appellees until the start of classes, well after Appellees paid the disputed sums to the University.  Likewise, we cannot agree that the Senate Council Meeting Minutes (Exhibit 1), the Administrative Regulations (Exhibit 8), or University Senate Rules (Exhibit 9) is part of any, specific written contract between Appellees and the University for the

---

[13]  Nevertheless, at the end of the day, the Court affirmed our reversal of the Franklin Circuit Court's denial of the University's motion for summary judgment because Dr. Britt had not filed her suit within one year of the completion date of her last written contract as required by KRS 45A.260(2).  *Britt*, 628 S.W.3d at 9.

payment of tuition and fees for the 2020 Spring Semester. While these documents may have been viewed by and/or accessible to Appellees we cannot agree that they were presented to Appellees as documents that would "control, decide, or affect [their] relationship" with the University at the time Appellees paid the tuition and fees at issue. *Britt*, 628 S.W.3d at 8. Documents, like the online admissions application and the course syllabi and guidelines, simply do not contain the "promises of performance to be rendered by each party" necessary to support formation of a legally binding contract, at least not with respect to the specific fees and tuition payments at issue here.[14] *Energy Home, Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)).

However, the Financial Obligation Statement, attached as Exhibit 6 to Appellees' first amended complaint, (R. at 105-07), and the other registration-related documents lead to a different conclusion. The Financial Obligation Statement was presented to Appellees as part of the online registration process, and the students were required to accept their financial responsibility to the University

---

[14] "The court finds no legal support for treating a course syllabus as a contract. The few courts that have considered the issue have concluded that a syllabus does not constitute a [legally binding] contract." *Gabriel v. Albany College of Pharmacy and Health Scis. - Vermont Campus*, No. 2:12-cv-14, 2012 WL 4718678, at *7 (D. Vt. Oct. 3, 2012) (collecting cases).

before completing their registration for the Spring Semester. In relevant part, the

Financial Obligation Statement provides:

> Please read the following statement and then ***click the accept button at the bottom of this page to continue the registration process***.
>
> . . .
>
> ***Request and completion of registration constitutes a contractual financial obligation to pay tuition and fees for which I am liable***. I am responsible for reading and understanding the current Drop/Refund policy of the University as it appears in the current Schedule of Classes. Permission to cancel enrollment does not constitute, nor shall it be construed as, a waiver by the University of my financial obligation. I understand that any financial assistance I receive will be applied against my billed charges to reduce my financial obligation.
>
> ***I am responsible for all outstanding debts and contracts with the University***. The University reserves the right to assess financial penalties on any indebtedness. Any past-due accounts may be referred to an outside collection agency or the Department of Revenue, which could result in collection fees. If my account is referred to an outside collection agency, I understand and agree to reimburse the University for any collection agency fees, **which may be based on a percentage at a maximum of 33% of the debt** and all costs and expenses including reasonable attorney's fees, the University incurs in such collection efforts. If my account is referred to the Department of Revenue, I understand and agree to reimburse the University for any Department of Revenue fees, **which are based on a percentage of 25% of the debt, plus 6% interest accrued daily**, and all costs and expenses including reasonable attorney's fees, the University incurs in any such collection efforts.

(R. at 105-06 (some emphases added).)

The Financial Obligation Statement is the converse of the handbook in *Furtula*. While the University explicitly disavowed its intent to form a contractual relationship in the handbook, the Financial Obligation Statement explicitly states that the University and its students are contracting one another for the payment of tuition and fees as part of the registration process. A student assents to the formation of this contractual relationship by clicking the "accept button" and then "request[ing] and complet[ing]" registration. (R. at 105.) Clearly, the "manifestation of mutual assent to the exchange," which was found lacking in *Furtula*, is present here insomuch as the University required its students to expressly consent to the formation of a "contractual financial obligation" with it. *See* RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981).

Despite the fact that the University required Appellees to click the accept button on the Financial Obligation Statement before they were allowed to complete registration for the Spring Semester, it argues in this appeal that Appellees "have never produced evidence to show they actually accepted the University's alleged offer." (Appellant's Brief at 12.) The University's Financial Obligation Statement is best described as a "clickwrap" arrangement, in which the user is required to "explicitly assent by clicking 'I agree' (or something similar) before using the website or purchasing a product." *Foster v. Walmart, Inc.*, 15

-28-

F.4th 860, 863 (8th Cir. 2021). "Applying ordinary contract law principles, courts routinely uphold 'clickwrap' . . . agreements . . . 'for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree."'" *Hidalgo v. Amateur Athletic Union of United States, Inc.*, 468 F. Supp. 3d 646, 654 (S.D.N.Y. 2020) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

In their first amended complaint, Appellees alleged that the University required them to electronically sign or acknowledge the Financial Obligation Statement.[15] (R. at 56.) This allegation, which we must accept as being true, *Brown-Forman Corporation v. Miller*, 528 S.W.3d 886, 889 (Ky. 2017), coupled with the nature of the Financial Obligation Statement convinces us that the parties manifested their mutual assent to be bound through their electronic interchanges with one another. And, under KRS 369.107(3), "[i]f a law requires a record to be in writing, an electronic record satisfies the law." Thus, we are satisfied that Appellees' electronic acceptance of the Financial Obligation Statement created a written contract with the University sufficient to satisfy KRS 45A.245.

While the University acknowledges that the Financial Obligation Statement referred to the creation of financial obligations, it points out that the

---

[15] Appellees further alleged that they were unable to include their individual acceptances because the University maintains each electronic copy and does not provide copies to the students. (R. at 56.)

document itself does not contain all the terms necessary, such as the amount owed, to stand on its own. While this may be true, the document was not presented to the students in isolation. A careful reading of the document, shows it was presented to the students at the inception of the registration process. (R. at 105) (emphasis added) ("Please read the following statement and then click the accept button at the bottom of this page *to continue the registration process*."). It is clear from this statement that the University's intent was for the registration and fee related documents to "control, decide, or affect its [contractual financial] relationship" with its students meaning those documents are part of the University's written contract with Appellees. *Britt*, 628 S.W.3d at 8.

Registration involves the completion of an online process whereby the student selects the type and number of classes she will take for the upcoming semester. The University Bulletin reiterates that students become contractually obligated to the University by completing registration.

> You become financially obligated to [the University]
> when you register for classes. The financial obligation
> can only be adjusted if you add/drop hours or withdraw
> from the University. It is your responsibility to comply
> with this policy and schedule for paying registration fees.

(R. at 128.)

The final amount to be paid by the student for tuition and fees depends on the specific degree program being pursued and the classes selected by

the student.  The exact amount of the mandatory fees and tuition is set out in the University Bulletin.  Important to this dispute, full-time graduate and undergraduate students with at least one course on campus were charged $674.50 in mandatory fees per semester while full-time undergraduate and graduate students with no courses on campus were charged $128.50 in mandatory fees per semester.[16]  (R. at 137.)  Specifically,

> Mandatory fees are listed separately above and will be assessed based on the student's full-time or part-time status, course delivery mode(s), and whether or not the student is enrolled in at least one on-campus course.  An on-campus course requires regular or periodic physical attendance on campus for instruction and/or assessment. The delivery modes for an on-campus course may include, but are not limited to, traditional classroom, hybrid (e.g., traditional classroom and Internet web-based),  compressed video, or satellite courses.  Unless stated elsewhere, students will be assessed a maximum $674.50 mandatory fees per semester.

(R. at 135.)

When the Financial Obligation Statement is considered in conjunction with the other registration documents, all the elements necessary for contract formation are met.  When boiled down to its simplest terms, through these written documents, the students and the University agreed to enter into a contractual relationship whereby the students agreed to pay the University fees and tuition in

---

[16]  "Mandatory student fees mean fees that are assessed to all full-time students, with the exception of those students who take all courses via the Internet or off-campus."  (R. at 143.)

accordance with the University's fee and tuition schedule as set out in the University Bulletin. In return, the University agreed to provide the students with access to the classes selected during registration and to make its facilities available for the students' use.[17] The terms are both "definite and certain" and set forth the "promises of performance to be rendered by each party." *Energy Home, Div. of Southern Energy Homes, Inc.*, 406 S.W.3d at 834 (citation omitted). Accordingly, we agree with the circuit court that Appellees and the University have a written contract with each other for the payment of fees and tuition for the Spring Semester, and that Appellees' breach of contract claim as set forth in their first amended complaint is "an action against the [University] on the contract" allowing this suit to proceed despite the University's governmental immunity. KRS 45A.245.[18]

## V. CONCLUSION

For the foregoing reasons, we reverse the portion of the Franklin Circuit Court's order relating to a source-of-funds rationale for finding waiver of

---

[17] For example, the University Bulletin states: "For the regular fall and spring semesters, payment of the mandatory health fee by full-time students entitles them to medical and behavioral health care at University Health Services." (R. at 128.)

[18] We reiterate that this Opinion is limited to a determination of the specific immunity questions discussed herein. The fact that we have determined that the University's immune status does not shield it from Appellees' breach of contract claims does not mean that we have determined that the University actually breached its contracts with Appellees. At this juncture, such a determination is beyond the scope of our appellate jurisdiction.

sovereign or governmental immunity, we affirm the remaining portions of the order which find the University's immunity has been waived by execution of a lawfully authorized written contract, and we remand for further proceedings not inconsistent with this Opinion.

CALDWELL, JUDGE, CONCURS.

CETRULO, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

CETRULO, JUDGE, CONCURRING IN PART AND DISSENTING IN PART: Respectfully, I concur in part and dissent in part with the majority Opinion. I agree that the Franklin Circuit Court's order relating to a source-of-funds rationale for finding waiver does not comport with the Supreme Court's reasoning in *Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 380-81 (Ky. 2016). I further agree that any claims for unjust enrichment are barred by governmental immunity. However, the majority's opinion that any breach of contract claim against UK falls within the scope of waiver of immunity under KRS 45A.245 necessarily requires a finding that there was a clear contract with which I cannot agree. Our recent Supreme Court decisions have certainly made the majority's conclusion understandable, but I would find this an implied contract at best.

"We will find waiver only where stated by the most express language[,] or by such overwhelming implication[s] from the text as [will] leave no

-33-

room for any other reasonable construction." *Withers v. University of Kentucky*, 939 S.W.2d 340, 346 (Ky. 1997) (internal quotation marks omitted) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S. Ct. 458, 53 L. Ed. 742 (1909)). *See also Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839 (Ky. 2019). The Supreme Court's decision in *Britt v. University of Louisville*, 628 S.W.3d 1 (Ky. 2021), did extend the written contract requirement of KRS 45A.245 and found a waiver of immunity based upon a series of letters and personnel policies. However, I cannot agree that this was the intention of the Legislature in enacting KRS 45A.245, nor that the documents relied upon herein by the majority created anything more than an implied contract. Kentucky has not waived immunity as to implied contracts. *Furtula v University of Kentucky*, 438 S.W.3d 303 (Ky. 2014). Therefore, I would find that immunity exists.

BRIEFS FOR APPELLANT:

Joshua M. Salsburey
Donald C. Morgan
Lexington, Kentucky

William E. Thro

Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLANT:

Joshua M. Salsburey
Donald C. Morgan
Lexington, Kentucky

BRIEF FOR *AMICI CURIAE*,
EASTERN KENTUCKY
UNIVERSITY, MURRAY STATE
UNIVERSITY, NORTHERN
KENTUCKY UNIVERSITY,
UNIVERSITY OF LOUISVILLE,
AND WESTERN KENTUCKY
UNIVERSITY:

Donna King Perry
Jeremy S. Rogers
Alina Klimkina
Louisville, Kentucky

August Johannsen
Lexington, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEES:

Andre F. Regard
Ivey L. Workman
Lexington, Kentucky